23 A.3d 277

**Bagada DIONAS**

v.

**STATE of Maryland.**

No. 1742 Sept. Term 2009.

Court of Special Appeals of Maryland.

July 1, 2011.

484

486

488

490

Deborah S. Richardson (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: KRAUSER, C.J., GRAEFF and KEHOE, JJ.

GRAEFF, J.

On August 7, 2009, a jury sitting in the Circuit Court for Baltimore City convicted appellant, Bagada Dionas, of the

following charges: (1) two counts of second degree murder; (2) three counts of first degree assault; (3) one count of use of a handgun in a felony or crime of violence; (4) five counts of openly carrying a dangerous weapon; and (5) two counts of conspiracy to commit first degree murder. On September 21, 2009, the circuit court imposed a sentence of life plus 170 years.[1]

On appeal, appellant presents the following questions for our review, which we quote:

1. Did the trial court err in precluding cross-examination into Sean White's expectation of leniency regarding his violation of probation?

2. Did the trial court coerce a jury verdict by propounding repeated improper *Allen* [2]-type charges even after the jury had revealed its numerical division?

3. Did the trial court err in failing to *voir dire* the juror who indicated he had been approached by someone about the jury's verdict and felt pressured by the jury?

4. Did the trial court err in imposing consecutive time for the conspiracy?

5. Was the evidence sufficient to support the conspiracy convictions?

6. Did the trial court improperly instruct on transferred intent and kill zone, two theories inapplicable to the first and second degree murder charges in this case?

---

1. The specific sentences imposed for each conviction are as follows: (1) 30 years for each count of second degree murder; (2) 25 years for each count of first degree assault; (3) 20 years for one count of use of a handgun in a felony or a crime of violence; (4) 3 years for each count of openly carrying a dangerous weapon; (5) life imprisonment for each count of conspiracy to commit first degree murder. Each sentence is to run consecutively, with the exception of the sentence on the second conviction for conspiracy, which is to run concurrent to the other life sentence.

2. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of July 15, 2007, Maurice White and Wayne White were shot and killed in a field near Wayne's apartment building on Radecke Avenue in Baltimore, Maryland.[3] Witnesses testified that appellant shot Maurice in the head, and he then began shooting at the car that Wayne's girlfriend, Tajah Flemming, was driving with their eight-month-old son in the backseat.[4] Sean White, who had been standing near the driver's side door of his car, which was parked near Ms. Flemming's car, jumped into Ms. Flemming's passenger seat. As appellant continued shooting at Ms. Flemming's car, Wayne began running toward the car, shouting for appellant to stop shooting because Wayne's son was in the car. Appellant shot Wayne in the leg, and another shooter, later identified as Charlie Stevenson, came from the back of a building and shot Wayne several times.

On August 6, 2007, appellant was indicted, in seven separate indictments, on charges of first and second degree murder of Wayne and Maurice, attempted first and second degree murder, as well as first degree assault, of Tajah Flemming, Sean White, and Khalee White, and related charges.

### A. Motions Hearing

On June 29, 2009, the circuit court held a pre-trial motions hearing. The State made a motion in limine to bar appellant from questioning any of its witnesses regarding any prior arrests. Counsel for appellant objected, noting that one of the State's witnesses, Sean, had an agreement with a judge about

---

**3.** Wayne White and Maurice White were friends; they were not related. Because they share the same last name, as does witness Sean White, we will refer to them using their first names.

**4.** Ms. Flemming's name is spelled as Flemming and Fleming in the record. For the purposes of consistency, we will use the spelling Flemming.

a pending charge, and arguing that there was "some question about ... that agreement and his testimony." The court inquired of the State whether the witness was testifying in the matter pursuant to a deal, and the State responded that there was no deal. The prosecutor explained that Sean had requested release from jail pending a violation of probation ("VOP") hearing because his brother had been murdered and the witness was scared in jail. Appellant's counsel argued that the witness had received favorable treatment when he was released pending the VOP hearing, noting that most individuals are incarcerated pending such hearings.

The court stated that there was no evidence of any quid-pro-quo between the witness and the VOP judge, and it appeared that the witness was released because it would be safer for him to be at home because of his involvement in appellant's trial. Appellant's counsel argued that the VOP judge was waiting to hold the witness' hearing until after Sean testified at appellant's trial, noting that he had agreed to testify, whereas many victims will not testify. The court ultimately stated that it did not believe that the VOP proceedings were impeachable evidence, but it agreed that appellant's counsel could raise the issue again at trial.[5]

Before trial commenced on July 27, 2009, the parties revisited the issue of Sean's expectation of leniency in his VOP hearing. Appellant's counsel argued that the issue was whether Sean expected to receive a benefit from the judge in exchange for his testimony in appellant's case. Although counsel acknowledged that the State had not offered Sean a deal in exchange for his testimony, counsel argued that the VOP judge had indicated to Sean that he would receive a benefit for testifying in appellant's case. Counsel noted that

---

5. At the hearing, appellant also moved to suppress several photo array identifications, although he ultimately conceded that the State should be able to introduce the photo arrays at trial. Counsel for appellant also informed the court that Mr. Stevenson, appellant's codefendant, had been found incompetent to stand trial. Although Mr. Stevenson subsequently was found competent to stand trial before appellant's trial began, the parties agreed to try appellant separately.

Sean's violation of probation hearing had been postponed for two years, suggesting that a postponement was granted after Sean's involvement in appellant's case was brought to the attention of the VOP judge. Counsel maintained that "[t]he case kept getting postponed because they wanted to . . . hear what happened to the murder trial," and that Sean received "home detention at the prompting of" the VOP judge.

The prosecutor responded that the VOP judge was aware of Sean's criminal record, which included only a probation before judgment on an attempted distribution charge, a possession of a handgun by a minor charge, and the resulting charge of violation of probation due to Sean's failure to obey all laws and by possessing the handgun. She stated that Sean was arrested for possessing a handgun after the murder, and he said that he had the gun because he was afraid. The prosecutor also noted that Sean had given statements to the police identifying appellant before his VOP.

The court then stated that the VOP judge's "intentions . . . could be motivated by a variety of factors, some of which are fully consistent with her empathy towards an individual who had never been convicted of an offense, except" being in possession of a firearm as a minor. Appellant's counsel provided the court with additional cases to review, and the court reserved on the issue pending its review of the cases.

## B. Trial

The State called Erika Palmer as its first witness. Ms. Palmer stated that she was at a tattoo party on Radecke Avenue on the evening of July 15, 2007, when she heard some arguing outside. She went to the window to see what was happening. An argument was taking place in the parking lot, which was lit with street lights. Ms. Palmer saw people arguing and then shooting firearms. She did not remember how many people were shooting, but she stated that one of the individuals was shot in the head, and the shooter was short, with brown skin and dreads or plaits in his hair. After she witnessed the shooting, Ms. Palmer ducked below the window because she did not want to see what was happening. Ms.

Palmer then went home, but she eventually contacted the police.

Ms. Palmer identified appellant as the shooter in a photo array.[6] She initially wrote that the photo of appellant "looks like" the shooter. The police told her, however, that she could only indicate whether the individual pictured was or was not the shooter, whereupon she wrote that appellant "is the shooter." At trial, she was uncertain if the shooter was in the courtroom.

Ms. Palmer stated that she observed the shooting from a second floor apartment. She was unable to estimate how far she was from the shooting, and she stated that the events occurred quickly. Ms. Palmer did not give the police any information regarding facial hair, clothing, tattoos, eye color, facial features, or hair color; she stated that it was too dark outside to observe details such as eye color. With respect to the gun, she was able to see only that the gun was big.

Tajah Flemming, the mother of Wayne's son, Khalee White, born November 15, 2006, testified next. On July 15, 2007, she went to Wayne's apartment on Radecke Avenue to pick him up and take him to her grandmother's birthday party. The couple and their son, who was eight months old at the time, left the party at approximately 9:30 p.m. and returned to Wayne's apartment. When they arrived, they noticed that the mother of Wayne's other children had written on the outside of his door. After Wayne called this woman, he and Ms. Flemming left his apartment and argued. Ms. Flemming and Khalee got in her car, and Wayne went back into the house to call Sean and Maurice to pick him up. Wayne then exited the house.

At that point, appellant approached Ms. Flemming's car and told her that she and Wayne needed to take their argument in the house "because that's where he sold his stuff." Ms.

---

6. Ms. Palmer admitted that she told the police that her name was Shannon Shawn. She explained that she gave the police the wrong name because she was "nervous and scared."

Flemming stated that her boyfriend was drunk, and appellant should not "pay him no mind." Appellant then left, and Ms. Flemming pulled out of the parking lot onto Radecke Road. Wayne was standing near a bench with some girls.

As Ms. Flemming was driving down Radecke Road, she saw Maurice and Sean driving toward the apartment complex. She made a U-turn so she could follow them. By the time Ms. Flemming returned to the apartment parking lot, Wayne and Maurice were talking to two other guys in the field; Sean was in his car. A couple of girls ran up to Ms. Flemming's car and told her that she needed to leave, at which point she saw appellant with a rifle. Appellant then shot Maurice in the head.

Appellant began shooting at Ms. Flemming's car, and Wayne ran toward the car, shouting: "My son is in there." Appellant then shot Wayne in the leg.

Meanwhile, Sean jumped into the passenger seat of Ms. Flemming's car. Ms. Flemming ducked down, put the car in reverse, and drove back toward Wayne to try to pick him up. Wayne never made it to the car because Mr. Stevenson came from behind a building and shot Wayne in the other leg, and then continued shooting him. Appellant resumed shooting at Ms. Flemming's car. She drove in reverse for two blocks, observing in her rearview mirror that Mr. Stevenson was chasing her car and firing his gun. She drove to Todd Avenue, where her car stopped operating. Sean jumped out of the car, and a woman invited Ms. Flemming and her son into her home to call the police.

Ms. Flemming went to the police station to speak with homicide detectives, and she identified appellant in a photo array as the person who shot Maurice and Wayne. She had seen appellant before the night of the shooting; he lived in Wayne's apartment complex during the year prior to the shooting, and she saw him six or seven times each week. Ms. Flemming identified Mr. Stevenson in a photo array as the other shooter. She told the police that he used a silver handgun.

Ms. Flemming had seen appellant and Mr. Stevenson together "all the time"; "[t]hey used to hang in the parking lot together." Ms. Flemming's 911 call was played for the jury and admitted into evidence.

Defense counsel questioned Ms. Flemming regarding inconsistencies in her initial statements to the police and her testimony at trial. According to the police report, Ms. Flemming told the police that she was in the building when she heard arguing outside, and as she exited the building, she saw two black males arguing with Wayne and Maurice. Ms. Flemming denied that the events occurred as the police reports described. She acknowledged that she did not identify appellant by name when she identified him as the shooter to the police because she did not know his name until she read it in the paper.[7]

Helen Washington, a Criminal Lab Technician for the Baltimore City Police Department, testified regarding the discovery and collection of evidence related to the incident and the chain of custody. Ms. Washington also identified photographs of the crime scene that were admitted into evidence.

James Locke, an Assistant Medical Examiner for the City of Baltimore, testified as an expert in the field of forensic pathology. On July 16, 2007, Dr. Locke performed the autopsies of Maurice and Wayne. The cause of Maurice's death was a close range gunshot wound to the head,[8] and the cause of Wayne's death was multiple gunshot wounds.[9]

---

7. Ms. Flemming also acknowledged that she knew Sean and Maurice only by their nicknames until she learned their legal names in the newspaper.

8. Dr. Locke explained that a close range gunshot wound generally refers to a wound sustained from a bullet fired within 24 inches of a target.

9. Wayne was shot four times in the head, apparently at close range. Dr. Locke opined that these shots caused Wayne's death. Wayne was also shot in the right side of his chest, though the bullet did not penetrate into the chest wall, indicating that the bullet was fired from a

Sean testified that he and his brother, Maurice, received a call from their best friend, Wayne, the evening of July 15, 2007. They drove to Wayne's apartment complex and approached Wayne, who was sitting outside on a bench. As Sean, Maurice, and Wayne were getting ready to leave, Sean saw appellant and three other people "come from behind the basketball court." Appellant, who was carrying a long, black, "army type" gun, approached them and told them to leave. Maurice and Wayne tried to "talk it out" with appellant. Maurice then turned to walk away, and appellant "started running towards [Maurice] . . . shooting." Sean, who was standing at the driver's side door of his car, shouted to his brother to "watch out," and when Maurice turned around to see what was happening, appellant shot him. Sean then jumped into the passenger seat of Ms. Flemming's car, which was parked behind his car. Meanwhile, Wayne ducked behind Sean's car to avoid being shot.

After Sean got into Ms. Flemming's car, she put the car in reverse, and she began backing out of the parking lot. The only people in the car were Sean, Ms. Flemming, and Khalee. As the car backed up, Sean heard gunshots continue from the direction where appellant was standing, and he heard bullets hit Ms. Flemming's car. Wayne stood up and began to run toward the car, screaming: "My son is in the car. Please stop shooting." Wayne was shot in the leg, but he continued to move toward the car, until he collapsed. Another individual ran to the scene, "stood over top of Wayne[,] and start[ed] shooting him" with a handgun. Neither Sean, Maurice, nor Wayne were armed, and none of them attempted to start a fight with appellant.

Sean went to the police station on July 16, 2007, to talk to the police. On July 24, 2004, he identified appellant as the individual who shot Maurice. Sean had seen appellant several times at Wayne's apartment complex prior to the incident. On cross-examination, Sean acknowledged that there were

distance. He was also shot in the leg and arm, shots also fired from a distance.

some inconsistencies between the police report summarizing his statement and his trial testimony regarding details of the shooting.

The court then recessed for the day, and appellant's counsel revisited her motion to cross-examine Sean regarding any expectation of leniency. The court stated that it had reviewed the cases appellant's counsel had submitted, but there was no evidence of a quid-pro-quo agreement between Sean and the VOP judge regarding his testimony at appellant's trial and his VOP sentence. The court further noted that Sean had given a statement to the police regarding appellant's case before he appeared in front of the VOP judge.

Appellant's counsel responded that the question was not whether the State had struck a bargain with Sean, but whether Sean subjectively believed that he would receive a benefit related to his sentence after testifying on the State's behalf at appellant's trial. The court dismissed defense counsel's argument regarding a witness' subjective belief that a bargain exists because "you can have somebody believing anything they want." The court denied defense counsel's request to cross-examine Sean regarding his expectation of leniency, with leave "to renew." When trial reconvened on July 30, 2009, as discussed in more detail, *infra*, the trial court further explained its ruling regarding defense counsel's request to cross-examine Sean regarding his expectation of leniency.

After the court addressed other matters related to the trial, defense counsel resumed cross-examination of Sean. Sean acknowledged inconsistencies in his testimony at the suppression hearing and in one of his initial statements to the police regarding his description of appellant's clothing.

Lisette Rivera, a Crime Lab Mobile Unit technician with the Baltimore City Police Department, testified that she processed a vehicle connected with the shooting.[10] She recovered a

---

10. Ms. Rivera described "processing" a vehicle as follows:
 [W]e photograph the vehicle as it is—as it is brought in to the forensic bay. We look to see if there's some structural damage on the vehicle.

metal fragment from the "front driver's side tire that was flat."

Detective Frederick Daum was the primary detective assigned to the case. He attended the autopsies at the Medical Examiner's office. A .45 caliber bullet was recovered from Wayne, which Detective Daum collected as evidence. At the crime scene, Detective Daum found three .45 caliber shell casings at the entrance of the parking lot to the apartment complex. The Crime Lab photographed the casings and collected them as evidence. Detective Daum collected DNA from appellant, and he requested that DNA and fingerprint analyses be performed on evidence collected at the crime scene.

Jocelyn Carlson, a DNA analyst for the Baltimore City Police Department, was accepted as an expert in DNA identification, analysis, and evaluation. She testified that Maurice's DNA was recovered from the scene, and appellant's DNA was found on a t-shirt and a baseball hat found at the scene.

Christopher Faber, a technician with the Baltimore City Firearms Examination Unit, was accepted as an expert in the field of firearms operability and identification. He examined 22 fired cartridge cases in relation to appellant's case. Five of the cartridges were .45 auto caliber, and they were fired by the same firearm. The remaining 17 cartridges were fired from a second firearm. Thus, Mr. Faber concluded that two firearms were used in the shooting. Mr. Faber was unable to determine whether the .45 caliber bullet recovered by the medical examiner from Wayne was fired from the same firearm as the cartridge casings because he did not have the original firearm.

At the conclusion of the evidence, counsel for appellant made a motion for judgment of acquittal on all counts. As relevant to this appeal, counsel argued that the State had

We also look for—in a case for a shooting—we look for metal fragments, bullets, bullet holes, or any other type of damage done in the vehicle.

failed to prove that appellant conspired to kill Wayne and Maurice. Counsel asserted that, even if the jury credited Ms. Flemming's and Sean's testimony, "you do not have any working together at all between [Mr.] Stevenson and [appellant]." She argued that Mr. Stevenson and appellant were not in each other's presence, and they were not together. The court denied the motion, explaining: "Even the method and manner in which they approached and acted together, I believe a [j]ury could infer that there was an agreement to act with respect to the two conspiracy charges."

The trial court then instructed the jury, and the parties gave their closing arguments. On August 7, 2009, after six days of deliberations, the jury returned its verdict. As indicated, it found appellant guilty of the following charges: (1) two counts of second degree murder; (2) three counts of first degree assault; (3) one count of use of a handgun in a felony or crime of violence; (4) five counts of openly carrying a dangerous weapon; and (5) two counts of conspiracy to commit first degree murder.

This timely appeal followed.

## DISCUSSION

### I.

### Cross–Examination of State's Witness

Appellant's first contention is that "the trial court erred in precluding cross-examination into Sean White's expectation of leniency regarding his violation of probation." He asserts that Sean had received "preferential treatment by being released pending a violation of probation hearing," and he had "an expectation of leniency" regarding his ultimate sentence as a result of his cooperation in the State's case. Appellant maintains that "[t]here was sufficient circumstantial evidence of Sean's expectation of leniency regarding his violation of probation that the jury should have been allowed to make a credibility determination regarding Sean's motives" for testifying on behalf of the State.

The State argues that the trial court properly limited cross-examination of Sean regarding any expectation of leniency. In support, the State asserts that the judge presiding over Sean's VOP matter "did not extend any benefit or consideration to [Sean] in exchange for his testimony in favor of the State." In any event, the State argues, even if the court erred in limiting cross-examination, any error was harmless and does not require reversal of appellant's convictions.

## A. Proceedings Below

As indicated, *supra*, appellant's trial counsel sought to cross-examine Sean about his expectation of leniency regarding a violation of probation charge. The charges involved his possession of a handgun as a minor, which violated the condition of his probation on an attempted distribution charge that he obey all laws.

On November 6, 2008, in support of his request to be released pending the hearing on the VOP charge, Sean's counsel stated that Sean was a witness for the State in its case against appellant. The State deferred to the Pre–Trial Services caseworker, who did not oppose Sean's release, provided a curfew of 6:00 p.m. to 8:00 a.m. be imposed and that Sean attend school or a job during the daytime hours. The State then requested that, if Sean was released, he be placed under house arrest unless he could prove that he was working.

The judge who presided over the bail review matter, and who would eventually preside over the VOP hearing (the "VOP judge"), then stated:

Well, you have a Violation of Probation date of December 8. The last time the case was here for a violation hearing on October 20, the Defense requested this postponement for the Defendant to complete cooperation in this other criminal matter and the date of December 8 was selected for the violation.

After further discussion, the VOP judge stated:

[Sean has] been at the Baltimore City Detention Center in protective custody and obviously has been safe in that

environment. And you're asking him now to be released into the community at a time when it's anticipated that he's going to give testimony as a witness in a double homicide case.

\* \* \*

All right. After hearing from all of the parties involved, knowing that the Pre–Trial Service Division has no opposition to [Sean's] request for home detention provided that there's a curfew from 6:00 p.m. to 8:00 a.m., that the Defendant is either in school or in jail, and that the State has no opposition to this request either, the Court is going to grant [Sean's] request for bail review. I'll make this comment, that all of the parties have noted that [Sean] is a witness in a criminal homicide prosecution. And we are all aware of the dangers occasioned by that type of participation.

[Sean] has been in protective custody at the Baltimore City Detention Center. Normally where witnesses are concerned, the State doesn't incarcerate them. So I don't think [Sean] should be held against his wishes for his own safety. But the State has told me that the family has refused to [re]locate from this [ ] address. [Sean's counsel] has told me that they've considered this situation and nonetheless want the request for bail granted with [Sean] to be released into the community under the circumstances that he is expected to testify as a primary witness for the State in a double homicide case.

\* \* \*

All right. So those are not facts that the Court would hold against [Sean], because that doesn't provide a basis to incarcerate someone, for their own protection. But these are certainly serious, serious circumstances. All right.... [Sean] ... received Probation Before Judgment ... on August 20, 2007 after attempted distribution was the offense that [the court] struck the guilty finding for. The facts of that case were that [Sean] did distribute a controlled dangerous substance to a woman on the street.

Since he's been on probation he was charged with another drug felony, that case was dismissed. He's now charged with a firearms offense and has pled guilty to that; and received the six month sentence. A defendant who is under a sentence of Probation Before Judgment, even for what we classify [a]s a misdemeanor offense, but it's drug dealing nonetheless, and then becomes convicted of a firearm offense, stands a very good likelihood of receiving a substantial sentence of incarceration on Violation of Probation.

I've been advised about the extenuating circumstances here, [Sean] suffering the loss of his brother and a friend. And his participation with the State as a witness for continuing his Violation of Probation case to see the outcome of that. And it's the intent of the parties to bring that to my attention at the time of his sentencing. Taking all of these matters into consideration and the no opposition of Pre–Trial and the State, the Court grants the Defense's request for bail reduction.

The court released Sean on the condition that he participate in a home detention program, abide by the 6:00 p.m. to 8:00 a.m. curfew, and enroll in school or find employment. Sean was also ordered to participate in telephonic supervision by Pre–Trial Services.

At trial in this case, appellant's counsel argued that Sean's testimony on behalf of the State was motivated by his expectation of leniency with respect to sentencing on his VOP charge. Counsel maintained that Sean's expectation that the VOP judge would impose a more lenient sentence was bolstered by the fact that she reduced his bail pending the VOP hearing.

In addressing the issue, the trial court noted: (1) that Sean had made a statement to the police prior to his appearance before the VOP judge; and (2) that it was the VOP judge "who said[ ] we'll see how it goes after you've testified," and "who postponed this case on her own, sua sponte, without any discussion between the State acknowledging that we agree

with you; we encourage you to give it up. So there's a big difference."

The following colloquy then occurred:

[DEFENSE COUNSEL]: Your Honor, the only thing I would say to that, is that the—one of the postponements; the initial postponement, was due at the request of the defense counsel, who was acting on behalf of his client.

In addition to that, Your Honor, the case, I believe is Watson; indicated that it is not that the State struck a bargain, but whether or not the person who gave the statement believes that a benefit will derive from whatever happened; the postponement, or the letting out on bail.

It's the perspective of the defendant, not that, in fact, that a bargain exists between the defendant and the State. And I believe that was exactly the words out of [the VOP Judge]. But I can't tell you right off the top of my head, because I don't have the case with me.

THE COURT: Well, I don't know how it could be someone who was promised a benefit. Only the State could do that. The Judge who has nothing to do with this case, who wasn't asked to intercede by the State; but by the defendant's attorney.

[DEFENSE COUNSEL]: And the case law says; it's from his perspective that we look ...

THE COURT: Look. I don't think so. Because you can have somebody believing anything they want. You're free, however, to bring case law.

And at this point, I am denying your motion with leave for you to renew.

The following day, the parties revisited the issue, and the court clarified its ruling. The court stated that there was an agreement between Sean and the VOP judge, but the judge did not tell Sean "directly or indirectly that he had to testify one way or another. That is for the State or for the defense." The court emphasized that the VOP judge did not say " 'testify truthfully' " or "in a manner consistent with the conviction of the defendant."

Later that day, after cross-examination of Sean had concluded, and after lunch, the prosecutor informed the trial judge that Sean's violation hearing had been held. At the hearing, the VOP judge inquired whether Sean had testified "consistently." The trial judge reiterated there was no deal that Sean testify "one way or the other[,] [o]nly that he testify."

## B. Scope of Cross–Examination

"The Confrontation Clause of the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee a criminal defendant the right to confront the witnesses against him." *Martinez v. State,* 416 Md. 418, 428, 7 A.3d 56 (2010). A criminal defendant has the right to cross-examine a witness regarding "possible biases, prejudices, or ulterior motives of the witness." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). *Accord Martinez,* 416 Md. at 428, 7 A.3d 56; *Marshall v. State,* 346 Md. 186, 192, 695 A.2d 184 (1997).

The right to cross-examine a witness, however, is not unlimited. *Martinez,* 416 Md. at 428, 7 A.3d 56. "A trial court may impose reasonable limits on cross-examination when necessary for witness safety or to prevent harassment, prejudice, confusion of the issues, and inquiry that is repetitive or only marginally relevant." *Id.*

The scope of cross-examination is a matter left to the discretion of the trial court. *Smith v. State,* 196 Md.App. 494, 544, 10 A.3d 798 (2010). In exercising that discretion, a court must balance " 'the probative value of an inquiry against the unfair prejudice that might inure to the witness.' " *Id.* (quoting *Pantazes v. State,* 376 Md. 661, 681, 831 A.2d 432 (2003)).

When the cross-examination involves the potential bias or prejudice of a witness, a defendant must be accorded " 'wide latitude' " in cross-examination. *Id.* at 546, 10 A.3d 798 (quoting *Smallwood v. State,* 320 Md. 300, 307–08, 577 A.2d 356 (1990)). As the Court of Appeals has explained:

Only when defense counsel has been "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness[,]" is the right of confrontation satisfied. *Davis,* 415 U.S. at 318 [94 S.Ct. 1105]. Consequently, a trial court may exercise its discretion to limit cross-examination only after the defendant has been afforded the " 'constitutionally required threshold level of inquiry.' "

*Martinez,* 416 Md. at 428, 7 A.3d 56 (quoting *Smallwood,* 320 Md. at 307, 577 A.2d 356). When the trier of fact is a jury, questions concerning bias or motive of a witness should be prohibited " 'only if (1) there is no factual foundation for such an inquiry in the presence of the jury, or (2) the probative value of such an inquiry is **substantially** outweighed by the danger of undue prejudice or confusion.' " *Calloway v. State,* 414 Md. 616, 638, 996 A.2d 869 (2010) (quoting *Leeks v. State,* 110 Md.App. 543, 557–58, 678 A.2d 80 (1996)).

 In the present case, the trial court appeared to preclude the cross-examination based on the first prong. Its comments indicated that, in the absence of a specific deal in exchange for specific testimony, there was no factual foundation showing bias. This ruling was erroneous.

 A defendant seeking to explore a witness's bias by cross-examining him or her regarding an expectation of leniency is not required to present evidence of an agreement between the witness and the State or the court. *Brown v. State,* 74 Md.App. 414, 420, 538 A.2d 317 (1988). *Accord Calloway,* 414 Md. at 637, 996 A.2d 869. Rather, the " 'the crux of the inquiry ... is the witness's state of mind. What is essential to the preservation of the right to cross-examine is that the interrogator be permitted to probe into whether the witness is acting under a hope or belief of leniency or reward.' " *Brown,* 74 Md.App. at 421, 538 A.2d 317 (quoting *Fletcher v. State,* 50 Md.App. 349, 359, 437 A.2d 901 (1981)). *Accord Calloway,* 414 Md. at 637, 996 A.2d 869. The critical issue is " 'what the *witness* understands he or she will receive,

for it is this understanding which is of probative value on the issue of bias.'" *Brown,* 74 Md.App. at 421, 538 A.2d 317 (quoting *Hoover v. State of Maryland,* 714 F.2d 301, 305 (4th Cir.1983)).

In *Calloway,* the Court of Appeals held that the trial court erred in prohibiting cross-examination of a State's witness regarding whether he hoped that, in exchange for his testimony, he would receive a benefit. 414 Md. at 619–20, 996 A.2d 869. The Court held that the determination whether the witness was testifying at trial "in the hope of avoiding a violation of probation charge[ ] should have been decided by the jury." *Id.* at 637, 996 A.2d 869. It explained that the issue was whether the witness had a hope of a benefit, not whether the State had offered to make a deal or bargain with the witness. *Id.*

In the present case, the defense similarly sought to question Sean regarding whether he had any hope that he would receive leniency in his VOP hearing as a result of his testimony in appellant's case. Given that Sean's VOP hearing had been postponed for him to "complete cooperation" in appellant's case, and that the VOP judge had granted bail pending the hearing and stated that the parties would bring to her attention at the sentencing hearing his participation as a witness in appellant's case, there was a sufficient factual foundation to support the requested cross-examination. The trial court erred in finding otherwise and in restricting cross-examination of Sean regarding any expectation of leniency in return for his testimony.

### C. Harmless Error

Although we hold that the trial court erred in restricting defense counsel's cross-examination, that is not the end of the inquiry. *See Moore v. State,* 412 Md. 635, 666, 989 A.2d 1150 (2010) ("not every error committed during a trial is reversible error"). As the State notes, error that is harmless does not require reversal of a defendant's convictions. The State argues that, any error in restricting cross-examination here was harmless, stating that, "even if [Sean's] testimony is

not considered because [appellant] was not permitted to expose Sean's alleged bias in testifying," there was "other equally damning evidence" against appellant that established appellant's guilt beyond a reasonable doubt.

The Court of Appeals has set forth the standard for assessing harmless error as follows:

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded— may have contributed to the rendition of the guilty verdict.

*Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976). *Accord Morris v. State*, 418 Md. 194, 221–22, 13 A.3d 1206 (2011).

■ In determining whether an erroneous restriction on cross-examination is harmless error, our analysis is as follows:

Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Owens v. State*, 161 Md.App. 91, 111, 867 A.2d 334 (2005) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

■ Applying these factors, we hold that the error here was harmless. The State's case against appellant was strong, and Sean's identification of appellant, albeit important, was cumulative to the testimony of other witnesses identifying appellant as the shooter. Appellant was given ample opportu-

nity to cross-examine Sean, other than regarding the VOP proceedings, and the impact of that cross-examination would have been minimal under the circumstances of this case.

Even without Sean's testimony, there was strong evidence against appellant. Ms. Flemming testified that she observed appellant shoot Maurice in the head, shoot at her car, and shoot Wayne in the leg. She testified that Mr. Stevenson and appellant shot and killed Wayne as he tried to run to her car. Other than some inconsistencies as to the details of the shooting, an undoubtedly stressful event, Ms. Flemming's identification of appellant was unimpeached. No motive was suggested for Ms. Flemming to falsely identify appellant, and her identification of appellant as the shooter was unequivocal. And Ms. Flemming's observations of appellant were not limited to the night of the shooting; she previously had seen appellant on multiple occasions. Ms. Flemming testified that appellant lived in the same apartment complex as her boyfriend, she saw appellant probably six or seven times per week, and she saw appellant and Mr. Stevenson together "all the time." Her trial testimony identifying appellant as the shooter was consistent with her pre-trial identification of appellant in a photo array shortly after the shooting. Ms. Flemming's identification of appellant was very strong.

Another witness corroborated Ms. Flemming's identification of appellant as the shooter. Ms. Palmer, who observed the shooting from the window of an apartment, identified appellant in a photo array as the shooter. To be sure, this identification was not as strong because Ms. Palmer could not identify appellant as the shooter at trial, and she testified that she initially stated during the photo array identification that appellant "looked like" the shooter, writing that appellant "is the shooter" only after the police told her she could only indicate whether the individual pictured was or was not the shooter. Her testimony, however, did corroborate the very strong identification by Ms. Flemming.[11]

---

11. The DNA evidence also indicated appellant's presence in the area.

With respect to the cross-examination permitted, defense counsel was given ample opportunity to question Sean, other than the prohibited questioning at issue here. And the impeachment potential of the restricted evidence, under the facts of this case, was not substantial. Sean had positively identified appellant two times as the shooter shortly after the murder, prior to any VOP proceedings. Questioning about any expectation of leniency regarding Sean's VOP charge would not have detracted from his earlier identifications of appellant.

Even if the requested cross-examination would have convinced the jury to disregard Sean's testimony, as indicated, there were two other witnesses identifying appellant as the shooter. Sean's testimony was a cumulative third identification. *See Owens*, 161 Md.App. at 112, 867 A.2d 334 (restriction in cross-examination of witness who provided a "cumulative fourth identification" was harmless error).

At oral argument, counsel for appellant argued that, despite the strong evidence against appellant, and the limited impeachment value of the excluded evidence, the error was not harmless. In support, counsel pointed to the length of deliberations and that the jurors had indicated on the second day of deliberations that they could not reach a verdict. Neither appellant nor the State cited any cases addressing whether lengthy deliberations or a note such as that sent by the jury here were relevant to a finding of harmless error.

Addressing first the length of deliberations, courts have disagreed on whether that fact has any bearing in a harmless error analysis, in particular with respect to an analysis of the strength of the State's case. *Compare United States v. Williams*, 212 F.3d 1305, 1311 n. 10 (D.C.Cir.) (courts should "hesitate to connect the length of deliberations with the strength of the government's case"), *cert. denied*, 531 U.S. 1056, 121 S.Ct. 666, 148 L.Ed.2d 568 (2000), *with United States v. Velarde–Gomez*, 269 F.3d 1023, 1036 (9th Cir.2001) (en banc) ("Longer jury deliberations 'weigh against a finding of harmless error' because lengthy deliberations suggest a

difficult case."); *United States v. Varoudakis,* 233 F.3d 113, 126 (1st Cir.2000) (same). Even the courts that have looked to the length of deliberations, however, have noted that a lengthy deliberation may result, "not because of indecision, but [from] 'a diligent and conscientious attempt to evaluate the evidence, and to verify the testimony of different witnesses and to come to a careful and reasoned decision.' " *Varoudakis,* 233 F.3d at 126–27 (quoting *Clark v. Moran,* 942 F.2d 24, 32–33 (1st Cir.1991)).

In the present case, the jury deliberated for a period of time approximating five days.[12] Although this is a lengthy period of time, it was in the context of a trial that spanned four days and involved 33 different counts, involving different legal theories. During the deliberation period, the jury sent out multiple notes, asking for definitions of the different offenses, clarification regarding the elements of a crime, and information about specific evidence that was introduced. Under these circumstances, the length of deliberations reflects a conscientious attempt to reach a reasonable decision, and it does not weigh against a finding of harmless error.

Nor do we find that the two jury notes indicating difficulty reaching a unanimous verdict weigh against a finding of harmless error. Both notes were written on the second day of deliberations, the first after less than six hours of deliberation. And, as indicated, the subsequent deliberations, including the notes requesting more guidance regarding the nature of the crimes charged, show a diligent attempt to reach a careful decision.

Given the strong evidence against appellant, and the limited impact that the cross-examination likely would have had, we hold that the court's restriction of cross-examination, although error, was harmless. Appellant is not entitled to a new trial on this ground.

---

**12.** Although the jury deliberated on six separate days, on two of those days, the deliberations lasted only a couple of hours. The first day, the jury deliberated approximately three hours, and on the last day, the record reflects that the jury deliberated less than two hours.

## II.

### *Allen*-type Instructions

Appellant's second contention is that "the trial court coerced a jury verdict by propounding repeated improper *Allen*-type charges even after the jury had revealed its numerical division." He asserts that, after receiving several notes from the jury over its six days of deliberations, indicating that the jury was struggling to reach a unanimous verdict, the court issued "indubitably coercive" instructions to the jurors. In particular, he argues that the court failed to instruct the jury "that the verdict must be considered judgment of each juror," and that they must "deliberate with a view toward reaching an agreement without doing violence to individual judgment," or "surrender[ing] their honest beliefs." The court's instructions, he asserts, "sen[t] a clear indication to the holdout juror that it was time to change his or her vote," which he asserts "had the intended effect." [13]

The State argues that appellant did not properly preserve this claim because he did not raise timely objections to the jury instructions to which he objects on appeal. The State further contends that, even if preserved, the trial court's instructions to the jury to continue deliberations were proper, noting that the trial lasted four days and "[t]here were 32 charges against Dionas in connection with crimes of violence against five victims." [14] Because the jury was required to assess the evidence to determine if the State had met its burden for each of the 33 charges, the State contends that the trial court properly instructed the jury to continue deliberations. The State additionally argues that the court's instructions to the jury to continue to deliberate were not coercive.

---

**13.** At oral argument, counsel for appellant argued that, given the jury notes, the court erred in denying appellant's request for a mistrial. Because that argument was not raised in the briefs, we decline to consider it. *See Md. Auto. Ins. Fund v. Baxter*, 186 Md.App. 147, 154, 973 A.2d 243 (2009) ("Ordinarily, we will consider as waived any issue not raised by an appellant in its opening brief.").

**14.** As indicated, there were 33 charges against appellant.

## A. Proceedings Below

The jury retired for deliberations on July 31, 2009, at 12:50 p.m. They deliberated until 4:59 p.m., when they indicated they had a question for the court. At 5:17 p.m., the jury returned to the courtroom and the court released them, advising that it would answer the question when they returned.

On Monday, August 3, 2009, the second day of deliberations, the court answered the jury's question regarding the definition of first and second degree murder, and it clarified which exhibits were in evidence for consideration. The jury retired to deliberate at 10:05 a.m. At 11:37 a.m., the jury sent a note indicating that it was unable to reach a unanimous verdict on any charge.

The court instructed the jury as follows:

Is there anyone among you who is a history buff? Who said we have not yet begun to fight? John Paul Jones. But I think MacArthur said it too, I think you're right.

In the same token, you have not yet begun to deliberate. Your verdict must be the considered judgment of each of you. Before I read you this, let me tell you this also. It is not uncommon for a group of 12 people, most of which have never served as a juror before, to believe early on in deliberations that a unanimous verdict can't be reached. In fact, it is more often than not the case. So you are no different than thousands of juries that have appeared in this courtroom in the past where the majority of the jurors have never served before.

So having said that, your verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. Your verdict must be unanimous. You must consult with one another and deliberate with a view towards reaching an agreement if you can do so without violence to your own individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of all of the evidence with your fellow jurors.

During deliberations, do not hesitate to re-examine your own views. You should change your opinion if you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict. Having said that, you're released back into deliberations. Thank you ever so much.[15]

No objection was made to this instruction, and the jury resumed deliberations.

At 4:01 p.m. that afternoon, the court received another note, stating: "We the jury have deliberated the verdict to the best of our knowledge and can only agree on two counts." [16] The court stated that it did not think the jury had deliberated long enough, but it heard argument from counsel. The State argued that the jury had deliberated barely a full day, and it did not want to "give it up this fast." Defense counsel noted that the jury had advised the court twice, even after being given an *Allen*-type charge, that the best they could do was reach an agreement on two counts. The court stated:

Okay. I'm not cutting them loose, I don't think there's enough time. I don't think they believed me when I said you've not just begun to deliberate. Evidence was clear in my eyes, one way or another. Either you believed what you

---

**15.** This instruction was similar to that set forth in the pattern jury instruction on the duty to deliberate, which provides:

The verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. Your verdict must be unanimous. You must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. During deliberations, do not hesitate to reexamine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict. MPJI–CR 2:01.

**16.** The note specified that the jury agreed that appellant was not guilty of counts four and nine, unlawful wear, carry, or transport a handgun.

heard or you didn't believe what you heard and saw. Bring them out.

\* \* \*

Unless you want me to re-instruct them with the *Allen*, but I don't think I have to. I will if you want me to though . . . . here's the note. I would have pushed it further if I could have.

The court then addressed the jury as follows:

Members of the jury, I've received a note; we the jury have deliberated the verdict to the best of our knowledge and can only agree on two counts. You gave me the count number and the verdict. My instruction to you is I wasn't kidding when I said you were just beginning to deliberate. I don't have a humorous bone in my body. When I told you you've been in trial for a solid week and only been in deliberations for a day and a few hours, that's not nearly enough. You're released back into deliberations. If you don't reach a verdict by a little before 5:00 [p.m.], I'll release you for continued deliberations tomorrow. Thank you ever so much.

The jury was then released to resume deliberations at 4:05 p.m.

The court then advised defense counsel that she could make her objections again for the record. Counsel stated:

Your Honor, I just wanted to point out that I think this is a[ ] little different than the case that you had last week in that we've now had two notes where the jury—

\* \* \*

I mean in terms of you holding them or not holding them, it's just a gauge for me to see that last week you had a case that you held on for five days. In this particular situation, we've had two notes.

The court responded:

And, ma'am, I'm going to hold, in all sincerity and all frankness, I can't say it any other way. I'm going to hold them for five days. I believe it's appropriate to hold a jury

for at least the length of the trial to give them the opportunity to arrive at a unanimous verdict. Their findings along the way are insignificant to me and that's why I really don't share them.

Defense counsel then stated:

I understand that Your Honor. And I was just placing on the record that I think, as you've pointed out in this particular case, you could have a situation where you have six believing one side and six believing the other side. I mean, you said it yourself. You either believe he was there or he wasn't. So I think that this particular case is indicative of we have that situation where some literally believe he wasn't there and some believe he was there. And I'm just placing this on the record. I mean certainly a five day trial, I understand Your Honor where you're coming from. I just think that given the two notes, that to keep hammering and sending them back (inaudible). So, but thank you for letting me put it on the record.

At 5:00 p.m., the court received another note from the jury, seeking further instruction regarding the definition of a conspiracy and what constitutes aiding and abetting. The court answered the question. The court asked the jury if they wanted to continue deliberating or return the next day. The jurors wanted to come back the next day, and the court excused them at 5:13 p.m.

On August 4, 2009, the jury deliberated all day, with no further questions. On August 5, 2009, the fourth day of deliberations, the jury asked a question regarding the charge of use of a handgun in the commission of a felony or a crime of violence. The court answered the question, and the jury deliberated until 5:04 p.m.

On August 6, 2009, jury deliberations continued for a fifth day. At 10:28 a.m., the trial court discussed with counsel a jury note that inquired: "What are the consequences when some jurors are not cooperating with deliberations, blatantly disregarding the law of the land, and the evidence presented in this case?" Defense counsel asserted that the jury was

hung, stating that this was the third note saying they could not reach a verdict.

The court instructed the jury as follows:

I have a question [from the jury]; what are the consequences when some jurors are not cooperating with deliberations, blatantly disregarding the law of the land, and the evidence presented in this case. The answer is simple. Each of you took two oaths.... I take oaths very seriously.

You also took an oath when you were seated. Remember when I said: swear in the jury? You took an oath at that time to deliberate fairly and impartially on the evidence presented during the course of this trial and arrive at a verdict based on that evidence that's fair and impartial to both sides, free of any sympathy, bias, and prejudice. Also, I instructed you that each of you are absolute judges of the facts. Facts are as you find them to be. But you must also apply the law as I explained it to you, you've got no discretion. I told you that during the voir dire process and there was a question asked with regard is there anyone who is unable or unwilling to apply the law as I explain it to you.

In instructions, preliminary instructions and instructions at the end, I instructed you that you must apply the law as I explain it to you and that you have no discretion in this case whatsoever. And you took an oath to do just that. I am now again ordering you to go back into deliberations and deliberate on the evidence presented in this case. You can't guess what the evidence should have been. You can't guess what an answer to a question that was objected to would have been. You must base your decision on the evidence presented during the course of this trial along with all reasonable and logical inferences that flow therefrom. Free of any prejudice, bias, or sympathy one way or the other. The verdict must be fair and impartial and fair to both sides. Everybody understand that? If not, raise your hand and I'll go over it again.

But you do not have the right to go back there and make up evidence. In the same token, you can't guess that the

Defendant is guilty; he looks guilty, he didn't smile enough, he's too handsome to be guilty, none of that works. I instructed you that the burden of proof lies solely on the shoulders of the State. In order to convict the Defendant, based on the evidence, you must be satisfied that this Defendant committed one or more of the charges submitted to you beyond a reasonable doubt as I instructed you. Now, does anybody have any questions about this question? If so, now is the time to say it. I really do take your oath seriously. All right, you're released back into deliberations.

Defense counsel's only objection to this instruction was that the trial court stated that appellant "looks guilty." In response to counsel's objection, the court issued a curative instruction clarifying that the court was not stating its opinion regarding appellant's guilt, but that its statement related to appellant was an "example[ ] of what you can't guess." The court instructed the jury to base its verdict on the evidence presented at trial, and it admonished the jury that it could not consider appellant's decision not to testify or draw any inference from appellant's appearance. The court inquired of defense counsel whether its curative instruction alleviated counsel's concerns, and counsel stated: "That's great[,] Your Honor, thank you very much." The jury resumed deliberations at 10:45 a.m.

At 11:36 a.m. that day, the court informed the parties that it had received a note from a juror, which stated: "I did not talk to *no one*, about this case. I am being pick[ed] out. Some one [sic] that I do not know ask[ed] me if we came to a verdict. My verdict did not match there [sic] verdict it made the count 11 to 1, on more th[a]n one count[.]" The court sought clarification regarding the note from the jury, and the jury sent a note indicating that, "some member[s] of the jury were concerned because they ... saw juror number 9 confronted by someone in the gallery [ ] who asked if a jury had a verdict. Juror number 9 wrote the previous note to clarify what happened."

The court discussed with counsel the appropriate response,[17] and it ultimately advised the jury that juror number 9 did the right thing by notifying the court of the communication. It also advised the jury that the person who inquired whether the jury reached a verdict could have been anyone from the public, and to notify the court if they saw the person again or felt threatened in any way. Finally, the court instructed the jury not to consider the communication in any way during deliberations. The jury resumed deliberations at 12:02 p.m.

Defense counsel then requested a mistrial, arguing that juror number 9's letter indicated that he or she was being pressured by the other jurors. The court denied the motion, stating:

> Okay. And what I've done—I've instructed them that, previously, with regard to the [*Allen*] charge, and now I've instructed them with regard to this note, that they are not to take that contact and utilize it during deliberations, and it was the contact that was causing juror number 9 concern, and was causing other jurors concern. And I told them that they shouldn't in any way hold that against your client or against the State, and not even discuss it during deliberations. And I told them; nobody raised their hands.
>
> \* \* \*
>
> So, at this time I don't find manifest necessity.

At 5:09 p.m., the court informed counsel of another juror note. Juror number 12 had advised that his or her mother had passed away and asked to be released to assist in making preparations for the funeral.[18] The court, prior to informing counsel of the note, responded to the juror as follows: "You will not be released. Continue to deliberate but if you must

---

17. The court did not inform counsel of the jury breakdown.

18. Juror number 12's letter stated:
 My mother past last Friday 31, 09. I [continued] to be a outstanding citizen[.] No time to help prepare, funeral with my sisters and brother. I need to be dismissed, so I can take time for my mother home going. Funeral is Saturday August 8, 09.

leave earlier on any day, I will release the entire jury including you to return on the next day." When the court advised counsel of this response, no objection was noted.

The court then stated to counsel:

Now what I want to do, with your permission, I want to send [the jury] a note, especially in light of the fact that we've got a juror who's [sic], I believe, mother passed. I don't think he is necessary. But my note—in other words, for the preparations. They can make preparations without him. But at any age, a mother or father passing is significant. I'd like to ask then the jury as a whole if they believe that with continued deliberations they will be able to reach a unanimous verdict. If it's no, I'm just going to cut them loose. Especially in light of the death. Because I told them in the note, it was pretty harsh, did you read my note? I said: you will not be released, continue to deliberate. But if you must leave earlier on any day, I will release the entire jury, including you, to return on the next day. Now, I'm sure he didn't like that or she didn't like that.

Defense counsel suggested that the court ask whether additional deliberations would result in a unanimous verdict, which the court did. The jury responded: "So far in our deliberations, some days we have gotten closer to a unanimous verdict and some days we have gotten further away. It is difficult to determine whether more time to deliberate will result in a unanimous verdict." The court explained to counsel that it would bring the jury back one more day, but "after tomorrow, that's it." Defense counsel agreed, albeit expressing frustration with the jury.

The following day, August 7, 2009, the sixth day of deliberations, the jury reached a verdict.

### B. Preservation

We will address first the State's argument that appellant's contention regarding the court's *Allen*-type charges is unpreserved. To preserve a challenge to a jury instruction, a defendant must object at the time the instruction is given.

*See* Maryland Rule 4–325(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."); *Alston v. State,* 414 Md. 92, 110–11, 994 A.2d 896 (2010) (failing to raise a timely objection to a jury instruction constitutes waiver). *See also* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court.").

 The purpose of this preservation rule is " 'to ensure fairness for all parties in a case and to promote the orderly administration of law.' " *Robinson v. State,* 410 Md. 91, 103, 976 A.2d 1072 (2009) (quoting *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107 (1994)). "Fairness and the orderly administration of justice is advanced 'by requiring counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.' " *Id.* As we have explained:

> The purpose of Maryland Rule 8–131 is to allow the court to correct trial errors, obviating the necessity to retry cases had a potential error been brought to the attention of the trial judge. The Rule is also designed to prevent lawyers from "sandbagging" the judge and, in essence, obtaining a second "bite of the apple" after appellate review.

*Sydnor v. State,* 133 Md.App. 173, 183, 754 A.2d 1064 (2000), *aff'd on other grounds,* 365 Md. 205, 776 A.2d 669 (2001), *cert. denied,* 534 U.S. 1090, 122 S.Ct. 834, 151 L.Ed.2d 714 (2002).

 Appellant's argument on appeal, that the court coerced a jury verdict because it issued "indubitably coercive" instructions to the jurors, which failed to instruct the jury "that the verdict must be considered judgment of each juror," and that they must "deliberate with a view toward reaching an agreement without doing violence to individual judgment," or "surrender[ing] their honest beliefs," is not preserved for appeal. As indicated, many of the court's responses to the

jury notes were made without objection, and even when there was an objection, it was on a ground other than that raised on appeal. As such, appellant's contention that the instructions given by the court were coercive is not preserved for our review.

## III.

### *Voir Dire* of Juror

Appellant's third contention involves the note that juror number 9 sent on the fifth day of deliberations. As indicated, this note stated: "I did not talk to *no one*, about this case. I am being pick[ed] out. Some one [sic] that I do not know ask[ed] me if we came to a verdict. My verdict did not match there [sic] verdict it made the count 11 to 1, on more th[a]n one count[.]"[19] The court asked for clarification regarding the circumstances leading to the note, and the jury responded: "Some members of the jury were concerned because they saw Juror # 9 confronted by someone in the gallery (who asked if the jury had a verdict). Juror # 9 wrote the previous note to clarify what happened." After consulting with counsel, the court instructed the jurors that the communication by the third party to the juror should not be considered, and that the juror did the right thing by not responding. Appellant then requested a mistrial, "just for purposes of appellate review," based on the juror's indication that the other jurors were placing "influence" on him. The court found no manifest necessity to justify a mistrial.

On appeal, appellant contends that "the trial court erred in failing to *voir dire* the juror who indicated he had been approached by someone about the jury's verdict and felt pressured by the jury." He argues that a trial court is obligated to "take some action to determine whether or not an impaneled juror can render a fair and impartial verdict[ ] once

---

19. The court did not advise counsel of the split. With respect to the jury split, the court only read the following: "My verdict did not match their verdict."

the juror's impartiality has been called into question," but the trial court here "made no attempt to determine whether juror number 9, who indicated he was feeling pressure from the other jurors, had been impermissibly influenced by his or her interaction with the person who asked whether the jury had reached a verdict." Appellant asserts that, although the trial court "addressed the jury as a whole," it "never individually voir dired juror # 9," and "[t]he failure to do so denied [a]ppellant his right to a fair and impartial jury," which requires reversal of his convictions.

The State argues that appellant's contention is not preserved for review because he failed to request that the trial court *voir dire* juror number 9. In any event, it contends that the action that the trial court took, denying appellant's request for a mistrial and giving a curative instruction, "was appropriate given the circumstances and especially given that [appellant] did not ask the trial court to voir dire Juror No. 9." The State argues that, contrary to appellant's assertion, "a fair reading" of the note from juror number 9 "did not indicate that he was being pressured by the jury"; it merely informed the court that someone had approached the juror, and he or she had not violated the court's instructions by speaking with a third party. Even if the note communicated that the juror felt pressured, the State argues, it would have been improper for the court to question the juror because "such inquiry would certainly have involved inquiry into the juror's mental processes and statements during deliberations." The State argues that the court did not abuse its discretion in its response to the jury note.

Pursuant to the Sixth and Fourteenth Amendments of the United States Constitution and the Maryland Declaration of Rights, a criminal defendant has the right to trial by "an impartial jury." *Dillard v. State*, 415 Md. 445, 454–55, 3 A.3d 403 (2010). *Accord Jenkins v. State*, 375 Md. 284, 299, 825 A.2d 1008 (2003). This constitutional right requires that "a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and

argument introduced in open court," without "being swayed or tainted by outside influences." *Wardlaw v. State,* 185 Md. App. 440, 451–52, 971 A.2d 331 (2009) (citations omitted). A "trial court has an obligation to resolve questions of impropriety or threats to the integrity of the jury trial." *Dillard,* 415 Md. at 460, 3 A.3d 403.

If "evidence of [juror] misconduct indicates that a fair and impartial trial could not be had under the circumstances," the court must grant a motion for mistrial. *Summers v. State,* 152 Md.App. 362, 375, 831 A.2d 1134, *cert. denied,* 378 Md. 619, 837 A.2d 929 (2003). *Accord Jenkins,* 375 Md. at 340, 825 A.2d 1008; *Eades v. State,* 75 Md.App. 411, 420, 541 A.2d 1001, *cert. denied,* 313 Md. 611, 547 A.2d 188 (1988). We give deference, however, to the decision of the trial judge, who "is in the best position to evaluate whether a defendant's right to an impartial jury has been compromised." *Summers,* 152 Md.App. at 375, 831 A.2d 1134. *Accord Dillard,* 415 Md. at 454, 3 A.3d 403 (appellate courts review denial of a motion for a mistrial pursuant to an abuse of discretion standard).

Here, as the State notes, appellant never argued below, as he does on appeal, that it was necessary to *voir dire* juror number 9 to determine if he or she had been "impermissibly influenced" by a question from an unknown person regarding whether the jury had reached a verdict. Rather, the basis for the requested mistrial was that the juror indicated in his or her note that the other **jurors** were placing influence on the juror. Because no argument was made below that a *voir dire* of the individual juror was necessary to determine whether there was prejudice from the contact with the unknown person, that argument is not preserved for review. *See Stone v. State,* 178 Md.App. 428, 452, 941 A.2d 1238 (2008) ("ordinarily we will not consider an issue on appeal unless it 'plainly appears by the record to have been raised in or decided by the trial court ...'") (quoting Md. Rule 8–131(a)). *See also Klauenberg v. State,* 355 Md. 528, 541, 735 A.2d 1061 (1999) ("It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be

held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal."). *Accord Allen v. State,* 192 Md.App. 625, 637, 995 A.2d 1013, *cert. granted on other grounds,* 415 Md. 607, 4 A.3d 512 (2010).

In any event, even if the contention was preserved for review, we would find it to be without merit. To be sure, the Court of Appeals has held that, in certain situations involving outside contact with a juror, the court must conduct a *voir dire* examination of the juror to resolve whether there was actual prejudice before denying a motion for a mistrial. *Dillard,* 415 Md. at 460–62, 3 A.3d 403. In *Dillard,* after the testimony of Detective Smith, the State's primary witness in the drug charges against Dillard, two jurors walked by the detective, patted him on the back, and said: "Good job." *Id.* at 451, 3 A.3d 403. The Court of Appeals held:

> Without a *voir dire* examination of the jurors to determine the intent or sub-text of their comments and whether they had discussed the issue of Dillard's guilt or innocence, the trial judge did not have sufficient information to determine whether [the contact was sufficiently egregious that] the presumption of prejudice attached to the contact or to rule on Dillard's motion for a mistrial. Thus, the trial judge's failure to clarify the factual scenario raised by the contact between the jurors and Detective Smith constituted an abuse of discretion.

*Id.* at 457, 3 A.3d 403.

Direct questioning of a juror, however, is not always required. Situations requiring the court to conduct a *voir dire* examination of a jury panel prior to denying a motion for a mistrial include: (1) cases involving egregious juror and witness misconduct, which results in a presumption of prejudice; and (2) cases where the judge "lacked sufficient information to determine whether the incident was prejudicial." *Id.*[20] Neither of these situations is present in this case.

---

**20.** Even in these situations, questioning the jury is required only if the court intends to *deny* the motion for mistrial. In a situation where the

Here, there was not egregious conduct by a juror. The juror did not initiate the contact, he did not respond to the question, and the juror promptly reported the contact to the court.

■ Moreover, because the two jury notes clearly conveyed the nature of the contact, there was no need for further inquiry to resolve whether there was prejudice due to the contact. The notes made clear that the substance of the contact was innocuous; there was a mere inquiry into whether the jury had reached a verdict. *See Jenkins,* 375 Md. at 321, 825 A.2d 1008 ("not all incidental contacts between jurors and witnesses are inherently prejudicial").

■ We hold that, in cases involving juror contact with a third party, where the record is clear regarding what occurred and the contact is brief and incidental, a *voir dire* of the particular juror is not mandatory prior to denying a motion for a mistrial. Under the facts of this case, particularly where defense counsel never requested that the court *voir dire* the individual juror to obtain further information, the trial court did not abuse its discretion in denying the motion for a mistrial without first questioning the juror.

## IV.

### Merger

Appellant next contends that his separate sentences for murder and conspiracy to commit murder were illegal. Although he acknowledges that "convictions for a completed offense and a conspiracy to commit that offense do not merge under the required evidence test or the rule of lenity," he argues that merger is required here as "a matter of fundamental fairness." He asserts that "fundamental fairness requires the merger of sentences for a completed offense and a conspiracy to commit that offense where there is no evidence

---

nature of the outside influence is clear, and it involves either egregious juror misconduct or clear prejudice, the court may exercise its discretion to *grant* a motion for mistrial without the need to question the jury.

that the conspiracy embraced criminal objectives other than the substantive offense for which the defendant was convicted." In this case, he argues, "there was no evidence of any discussions between [a]ppellant and Charlie Stevenson prior to the shootings," and "the conspiracy was not shown to have objectives other than the completed offense of which [a]ppellant was convicted."

The State contends that appellant was properly sentenced. It emphasizes that "[c]onspiracy ... is not 'part and parcel' of the substantive crime of murder." Rather "[c]onspiracy to commit murder is a separate offense, for which the legislature intended a separate sentence." The State argues that "[p]rinciples of fundamental fairness do not trump the clear legislative intent to permit separate sentences."

 This Court recently addressed principles of merger in, *Moore v. State*, 198 Md.App. 655, 684–85, 18 A.3d 981 (2011), where Judge Woodward explained:

" 'The doctrine of merger of offenses for sentencing purposes is premised in part on the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution, applicable to state court proceedings via the Fourteenth Amendment.' " *Jones–Harris v. State*, 179 Md.App. 72, 98 [943 A.2d 1272] (quoting *Abeokuto v. State*, 391 Md. 289, 352 [893 A.2d 1018] (2006)), *cert. denied*, 405 Md. 64 [949 A.2d 652] (2008). The merger doctrine, which is derived from both federal and Maryland common law double jeopardy principles, "provides the criminally accused with protection from, *inter alia*, *multiple punishment stemming from the same offense.*" *Purnell v. State*, 375 Md. 678, 691 [827 A.2d 68] (2003) (emphasis added). "Under federal double jeopardy principles and Maryland merger law, the principal test for determining the identity of offenses is the required evidence test." *Dixon v. State*, 364 Md. 209, 236 [772 A.2d 283] (2001).

Pursuant to the required evidence test, the focus is "upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter

offense contains a distinct element or distinct elements, the former merges into the latter." *Id.,* 198 Md.App. at 685, 18 A.3d 981 (quoting *State v. Lancaster,* 332 Md. 385, 391, 631 A.2d 453 (1993) (emphasis omitted)). On the other hand, "if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts." *Id.* Accord *Kelly v. State,* 195 Md.App. 403, 440 (2010), *cert. denied,* 417 Md. 502, 10 A.3d 1181, *cert. denied,* —— U.S. ——, 131 S.Ct. 2119, 179 L.Ed.2d 912 (2011).

■■■■ Appellant concedes that, under Maryland law, convictions for a completed offense and a conspiracy to commit that offense *do not merge under the required evidence test.* See *Khalifa v. State,* 382 Md. 400, 433, 855 A.2d 1175 (2004). Appellant argues, however, that his sentences for second degree murder and conspiracy to commit first degree murder should merge under the doctrine of fundamental fairness.[21] The State disagrees, arguing that "separate punishments makes sense because the two crimes and penalties address different criminal behavior."

We agree with the State. The Court of Appeals has explained why convictions for a substantive offense and conspiracy to commit that offense are treated as separate crimes justifying separate sentences:

> Not only is the offense of conspiracy complete when the unlawful agreement is reached, but a conspiracy to commit a crime is entirely separate from the substantive crime. As this Court explained in *Grandison v. State,* 305 Md. 685, 759 [506 A.2d 580] (1986), regarding conspiracy to murder,
>
>> "once the agreement to murder has been made, the crime is complete without any further action. * * * Conspiracy to murder requires an agreement, while murder, regardless of whether one is convicted as an accessory or a

---

21. As indicated, appellant received two consecutive thirty-year sentences for second degree murder and two life sentences for conspiracy to commit first degree murder, the first life sentence to run consecutively to appellant's other sentences.

principal, requires the completed crime. Thus it is apparent that the conspiracy to murder is a separate and distinct crime from the substantive crime itself."

*Alston,* 414 Md. at 114, 994 A.2d 896. *Accord Wooten–Bey v. State,* 76 Md.App. 603, 627–30, 547 A.2d 1086 (1988) (conviction for conspiracy to commit robbery does not merge with conviction for attempted robbery), *aff'd* 318 Md. 301, 568 A.2d 16 (1990).

The circuit court did not err in imposing separate sentences for appellant's convictions for conspiracy to commit first degree murder and second degree murder.

## V.

### Sufficiency of Evidence

Appellant contends that the evidence was insufficient to sustain his convictions for conspiracy. Specifically, he argues that there was no evidence of an express agreement, and the fact that the two shooters did not begin shooting at the same time or in the same place "renders any 'concert of action' theory untenable."

The State disagrees, arguing that there was sufficient evidence to support appellant's convictions for conspiracy. It points to evidence showing that appellant was accompanied by other men prior to the shooting, and that both appellant and Mr. Stevenson shot at Wayne and Ms. Flemming's car. It argues that these facts, and "inferences that can reasonably be drawn from the facts," were sufficient to show that appellant and Mr. Stevenson "acted in concert to shoot and kill Maurice and Wayne White."

We review a challenge to the sufficiency of the evidence by determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Accord Bible v. State,* 411 Md. 138, 156, 982 A.2d 348 (2009); *Reeves v. State,* 192

Md.App. 277, 302, 994 A.2d 469 (2010). "If the evidence 'either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt[,]' then we will affirm the conviction." *Bible,* 411 Md. at 156, 982 A.2d 348 (quoting *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998)).

> The Court of Appeals has described a conspiracy as follows: "A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland, the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown."

*Mitchell v. State,* 363 Md. 130, 145, 767 A.2d 844 (2001) (quoting *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988)). *Accord Armstead v. State,* 195 Md.App. 599, 646, 7 A.3d 169 (2010), *cert. denied,* 418 Md. 191, 13 A.3d 798 (2011).

In *Armstead,* 195 Md.App. at 646, 7 A.3d 169, this Court described the State's burden in proving a conspiracy as follows:

> A criminal conspiracy may be shown by "circumstantial evidence from which an inference of common design maybe drawn." *McMillian v. State,* 325 Md. 272, 292 [600 A.2d 430] (1992) (citation omitted); *accord Berry v. State,* 155 Md.App. 144, 156, [843 A.2d 93] *cert. denied,* 381 Md. 674 [851 A.2d 594] (2004). The State is not required to show a formal agreement in order to prove conspiracy. As this Court has stated, "[i]t is sufficient if the parties tacitly come to an understanding regarding the unlawful purpose. In fact, the State was only required to present facts that would allow the jury to infer that the parties entered into an unlawful agreement." *Acquah v. State,* 113 Md.App. 29, 50 [686 A.2d 690] (1996) (citations omitted). And, a conspirator

"is liable for an act of a coconspirator not only when such act was part of the original plan but also when it was a natural and probable consequence of a carrying out of the plan." 4 WHARTON'S CRIMINAL LAW § 685, at 561–63 (15th ed.1996).

■ Here, Ms. Flemming testified that she frequently saw appellant and Mr. Stevenson together in the parking lot of the apartment complex, that she saw appellant shoot Maurice, and that appellant and Mr. Stevenson then shot Wayne as he ran toward her car. Ms. Flemming testified further that both Mr. Stevenson and appellant shot at her car. Sean similarly testified that he observed appellant shoot Maurice, and that both appellant and Mr. Stevenson shot Wayne.

With this evidence, a rational juror could infer that appellant and Mr. Stevenson had an understanding regarding the shooting of Maurice and Wayne. Therefore, there was sufficient evidence to support appellant's convictions for conspiracy to commit first degree murder.

## VI.

### Transferred Intent and Kill Zone Instruction

Appellant's final contention is that the trial court improperly instructed the jury regarding transferred intent and kill zone, two theories that appellant asserts were inapplicable to the charges in this case. He notes that "the State made clear that it was not relying on either of these two theories in its prosecution of this case," asserting instead that appellant had the specific intent to kill Maurice and Wayne.

The State notes that there was no objection to the instructions below, and therefore, it argues that appellant has waived his right to appellate review of this issue. It urges this Court to decline to exercise plain error review of this issue. The State argues that "there was no error, much less plain error, because the evidence clearly generated the court's instructions."

The instructions that are the subject of appellant's challenge on appeal involved the charges of attempted murder, both first and second degree. The court instructed the jury, in pertinent part, as follows:

Attempted murder in the first degree is defined as taking a step, beyond mere preparation, towards the commission of murder in the first degree. In order to convict the Defendant of ... attempted murder in the first degree, the State must prove ... that the Defendant took a substantial step, beyond mere preparation, towards the commission of murder in the first degree, or that the Defendant aided and abetted another towards the commission of murder in the first degree.

Now, based on the totality of facts and circumstances in evidence before you, you may, but are not required to find, that where the nature and scope of an attack, while directed at a primary or primary victim or victims was intended to insure the harm to the primary victim or victims by harming everybody in their path, or everybody in the primary victim's vicinity.

For example, when one places a bomb on a commercial airplane intended to harm a primary target on board, that person insures by this method of attack that all passengers will be killed. In that instance, the perpetrator by such intentional conduct and action, has intentionally created a zone of harm or danger to insure the death of his primary victim.

As you may, but are not required, to infer from the method and manner employed a concurrent intent to kill all in the intended victim's immediate vicinity so as to insure the primary victim's death. This is true without regard to whether or not the intended victim was, in fact, killed.

\* \* \*

And if you find, beyond a reasonable doubt, that the conduct that created the zone of danger was done willfully and with premeditation and deliberation, with intent to kill the primary actor, you may, but are not required, if you find

beyond a reasonable doubt, that there was a substantial step beyond mere preparation towards the commission of murder in the first degree.

* * *

And that the Defendant had the apparent ability at the time to commit the crime of murder in the first degree, or that he aided and abetted another who had the apparent ability at the time to commit the crime of murder in the first degree; and . . . that the Defendant created a zone of danger or aided and abetted another who created a zone of harm or danger as I instructed you, and that harm of danger was done willfully, and with premeditation and deliberation with intent to kill a primary actor.

If you find that, then all persons in that zone of harm you may, but are not required to find, attempted murder in the first degree. Does everybody understand that?

* * *

Now this is with regard to attempted second degree murder. When a person or persons engage in a shooting in a crowded urban city area, they collectively trigger an escalating chain reaction that creates a high risk to human life. Each participant displays a wanton and depraved indifference to any human life that may randomly fall within their overlap and deadly encounter.

Should death to an unintended victim or to an innocent bystander ensue, each participant in the illegal encounter has exhibited conduct that qualifies him for a depraved heart. Now this applies only to second degree murder and attempted second degree murder.

On August 3, 2009, the court, in response to a jury question, again instructed the jury regarding first and second degree murder. The court repeated its zone of danger instruction regarding the first degree murder charge, stating, in part, as follows:

[Y]ou can find first-degree murder [ ] one of two ways. And a death that was caused by the Defendant that was willful, deliberate, and premeditated as instructed by me a few

moments ago, or you could find a death that was caused by the Defendant willfully, and in which the nature and scope of an attack, while directed at a specific person or persons known as the primary victim, where the nature and scope of that attack was intended to ensure harm or death to the primary actor by harming or killing everyone that was in the primary victim's, or the intended victim's, vicinity. That replaces, you must find an intent to kill, but that replaces the need for deliberation and premeditation. Does everybody understand that?

The court proceeded to instruct the jury on second degree murder, making no mention of kill zone or transferred intent.

We address first the State's claim that appellant failed to preserve his objection to the instruction. As previously noted, Maryland Rule 4–325(e) requires a party to object to a jury instruction "promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Appellant failed to argue, as he does on appeal, that the court's instructions were not applicable based on the facts of this case. Accordingly, appellant's contention is not preserved for review. *See Alston,* 414 Md. at 110–11, 994 A.2d 896 (failure to object to instruction at trial precludes review of claim of error on appeal).

With respect to appellant's request that we exercise plain error review of the trial court's jury instruction regarding transferred intent and kill zone, we have made clear that such requests are not routinely granted. This Court recently discussed the plain error review analysis in *Kelly,* 195 Md.App. at 432, 6 A.3d 396, where we explained:

" '[P]lain-error review'—involves four steps, or prongs. First, there must be an error or defect—some sort of '[d]eviation from a legal rule'—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demon-

strate that it 'affected the outcome of the [ ] court proceedings.' Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' Meeting all four prongs is difficult, 'as it should be.' "

(quoting *State v. Rich,* 415 Md. 567, 578, 3 A.3d 1210 (2010)). We have explained that plain error review is a " 'rare, rare phenomenon.' " *Kelly,* 195 Md.App. at 432, 6 A.3d 396 (quoting *Hammersla v. State,* 184 Md.App. 295, 306, 965 A.2d 912 (2009)).

 Appellant has not convinced us that plain error review is warranted in this case. Appellant has not even attempted to show how this instruction, even if erroneous, affected the outcome of the proceedings to his detriment. The instructions at issue were given with respect to the charges of attempted first degree murder, attempted second degree murder, and first degree murder, charges on which appellant was found not guilty. We decline to exercise our discretion to address the propriety of the court's instruction in this regard.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**