REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND


No. 2106


September Term, 2011


WALTER PAUL BISHOP, JR.

v.

STATE OF MARYLAND


Eyler, Deborah S.,
Nazarian,
Moylan, Charles E., Jr.
    (Retired, Specially Assigned),

JJ.


Opinion by Nazarian, J.


Filed: August 26, 2014

Walter Paul Bishop appeals his conviction by a jury, in the Circuit Court for Harford County, after he confessed to the contract murder of William "Ray" Porter on March 1, 2010. Mr. Bishop admitted to police that Mr. Porter's wife, Karla Porter, had solicited him to kill her husband for $9,000. After the jury convicted him on the murder and other charges, it rejected the State's request for the death penalty and sentenced him to life with the possibility of parole. The trial court then imposed additional sentences for conspiracy to commit murder and possession of a handgun in the course of commission of the murder.

Mr. Bishop challenges these decisions on three grounds. *First*, he argues that the trial judge should have recused himself because thirteen years before, the judge (then a prosecutor) had been the target of a murder-for-hire plot, which in Mr. Bishop's view created an appearance of impropriety that prohibited the judge from presiding over this case. Mr. Bishop claims *next* that the judge should have recused himself because a legal intern who worked for the judge at the time of trial had previously assisted in Mr. Bishop's defense. *Finally*, he contends that the trial judge erred when he declined to merge the sentences for murder and conspiracy to commit murder, and when he imposed consecutive sentences for conspiracy and possession of a handgun in commission of the murder. We agree with all three of the circuit court's decisions and affirm the judgments.

## I. BACKGROUND

We need not recount the specifics of the contract in any detail, because Mr. Bishop confessed at his videotaped interview with police on March 6, 2010 that he agreed to kill Mr. Porter and, regrettably, carried out the agreement. The murder took place at a Hess gas

station in Baltimore County, and his case was specially assigned at first to the Honorable Thomas J. Bollinger. Because the State opted to seek the death penalty, and in light of Judge Bollinger's imminent retirement, the case was assigned specially to another judge, the Honorable Mickey J. Norman, on July 21, 2010.

### 1. Motions for Recusal

On August 30, 2010, Mr. Bishop filed two separate motions in which he sought Judge Norman's recusal from the case *first*, based on personal bias or prejudice and *second*, based on a conflict of interest.[1] He argued in the Bias Motion that because Judge Norman had been the target of a murder-for-hire case in the past, *see Denicolis v. State*, 378 Md. 646 (2003), he could not preside over Mr. Bishop's case without creating an "unacceptable appearance of impropriety"; as Mr. Bishop put it, Judge Norman "himself [had] fallen victim to a similar scheme." In the Conflict Motion, Mr. Bishop argued that a legal intern (the "Intern") working for Judge Norman at the time of his trial had been involved in Mr. Bishop's case while previously working at the Public Defender's Office, and that this prior knowledge created not just an appearance of impropriety but an "actual conflict of interest."

Although the facts of the underlying offense in this case don't matter for present purposes, the circumstances surrounding the Motions for Recusal matter a great deal. *See Jefferson-El v. State*, 330 Md. 99, 102 (1993) (noting that where, in a case such as this one, the "issue involves appearances, it is necessary that we set out in some detail the

---

[1] We refer to the first as the "Bias Motion," the second as the "Conflict Motion," and the two motions together as the "Motions for Recusal."

2

circumstances under which it arose"). Judge Norman denied the Motion for Recusal on both grounds, and we start with the more complex of the two.

### a. The Bias Motion

Because *Denicolis* ultimately was reported, we have here (as did Judge Norman) the benefit of its history preserved in the Maryland Reports. In the fall of 2000, Mr. Denicolis pled guilty to several robbery counts in a case prosecuted by Judge Norman, who was then an Assistant State's Attorney for Baltimore County. Mr. Denicolis plotted to murder both Judge Norman and the trial judge before whom he had appeared, the Honorable Dana Levitz, but police stopped him before he could carry out his plan. 378 Md. at 650-51. The issue on appeal, which has no relevance here, involved the trial court's treatment of a jury note, and ultimately formed the basis of a reversal. *Id.* at 658-59. As the Court of Appeals recounted, the prosecutor submitted a victim impact statement prepared by Judge (then-prosecutor) Norman in which he related the impact of being "'specifically targeted as the object of the defendant's criminal endeavor, singled out because I fulfilled my professional responsibilities as a prosecutor.'" *Id.* at 654. That victim impact statement formed the basis of Mr. Bishop's Bias Motion.

Judge Norman held a hearing on the Motions for Recusal on September 8, 2010 (the "Recusal Hearing"). Mr. Bishop contended that the State sought the death penalty against him because he committed the murder under a "contract for remuneration" that, under the death penalty laws in effect at the time, constituted an aggravating factor. *See* Md. Code

3

(2002) § 2-303(g)(1)(vi) of the Criminal Law Article ("CL") (repealed 2013). He argued that

Judge Norman's victim impact statement in *Denicolis* demonstrated that the Judge had

"considered himself a victim" in that case, which, Mr. Bishop contended, meant that his

"impartiality might reasonably be questioned" in this case, as the Maryland Code of Judicial

Conduct uses the term. He claimed that this appearance of impropriety compelled Judge

Norman to recuse himself in this complex and protracted death penalty case that was subject

to a "heightened standard of reliability." *See Miller v. State*, 380 Md. 1, 79 (2004) ("'In

capital proceedings generally, this Court has demanded that factfinding procedures aspire to

a heightened standard of reliability. . . . This especial concern is a natural consequence of the

knowledge that execution is the most irremediable and unfathomable of penalties; that death

is different.'" (quoting *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J., plurality

opinion))).

Judge Norman denied the Bias Motion at the Recusal Hearing. He explained that

although the case could readily have been reassigned at that point (neither the parties nor the

court had yet invested significant time), the court had an obligation to hear cases whenever

possible, and he felt he could hear and decide the case fairly notwithstanding his experience

in *Denicolis*:

> [U]nder the Maryland Rules of judicial conduct, among other
> things it talks about [how] a judge shall hear and decide matters
> assigned to the judge unless recusal is appropriate. It also states
> that judges must be available to decide matters that come before
> the court. The dignity of the court, the judge's respect for
> fulfillment of judicial duties and the proper concern for the

burden that may be imposed upon the judge's colleagues require that a judge not use disqualification to avoid cases that present difficult, controversial or unpopular issues.

[Counsel for Mr. Bishop] makes the point, and it is a good point, that we are in the very beginning stages of this case. It is not like there is a request for recusal after we have invested, that is the parties, have invested some time in the matter. And she makes the comment that it would be simple to simply reassign the matter. Well, I see that potentially as violative of that cannon I just read. Because while I agree it would be simple, when I signed up for this job, I knew that there would be times when the Court would be required to make difficult decisions. And I'm not to shy away from them. So I don't think that it is . . . the proper standard by which to measure.

\* \* \*

I listened . . . with somewhat of a chuckle in my own mind as [counsel] compares the allegations in this case to the situation in [*Denicolis*]. She says it was a life changing situation. Well, if it was, why didn't I remember it? Because I had forgotten all about it until you brought it up in your motion. And indeed, *my recollection of that circumstance is nothing compared to what I understand this case to be about.*

\* \* \*

But in terms of a life-changing situation, well, you just couldn't be more wrong. You talk about serious victimization. . . . I have been put in actually dangerous situations in my life. Still here. Never worried me. In many regards, the [*Denicolis*] case, having measured it from my own life experience was somewhat of a joke. Here is a young man who is sitting in the County Detention Center and he is ticked off, and there is no way I ever, ever felt threatened.

So it is not as life-changing as perhaps your limited life experience might lead you to believe. I didn't remember the case

5

until you brought it up in your motion. It has no significance to me. I don't consider myself a victim.

But beyond that, and I do see your point, there is a difference between petty theft and a speeding ticket. But in this situation it is—the circumstance regarding [*Denicolis*] was almost laughable.

But as I started to say, in [*United States v. Jordan*, 49 F.3d 152 (5th Cir. 1995)], one of the things—couldn't find anything in Maryland, as I point out. One of the things it talks about is courts do not insist on recusal where the judge's interest is remote, contingent, indirect or speculative. Your suggestion that for me an inconsequential situation in which I was, quote unquote, an alleged victim is speculative at best. And in terms of its remoteness, it was over ten years ago. As I said, I didn't remember it until you brought it up in your motion.

*So since you have failed to produce any evidence that this Court cannot be fair and impartial, and since you have failed to meet your burden of suggesting or proving that there is any appearance of impropriety, your motion to recuse is denied.*

(Emphasis added.) This might have been where matters ended, except that the State (to its credit) voluntarily provided Mr. Bishop's counsel a complete copy of Judge Norman's victim impact statement from the *Denicolis* trial. The whole statement matters, as much for what it did *not* contain as for what it did (and we discuss that below), so we recount it in its entirety here:

Realizing that the defendant solicited another to murder Judge Levitz and myself has had an impact upon me. Crime victims often express fear of retaliation by a criminal defendant. As a veteran prosecutor I attempt to dispel those fears to give the victim peace of mind. I explain that most victims of robbery, burglary or other similar offense are not the specific target of the defendant's criminal venture, but rather, . . . are targets of

6

opportunity where the motive for the crime was to obtain goods or property. In attempting to dispel my own concerns as a victim, I realized that the defendant's crime has indeed affected me. Unlike the victim of a crime who is merely a target of opportunity, I was specifically targeted as the object of the defendant's criminal endeavor, singled out because I fulfilled my professional responsibilities as a prosecutor.

The Baltimore County police informed me of the solicitation to murder so that I could take whatever measures I deemed necessary for the safety of my family and myself. There was little I could do except to put my family on notice of the defendant's intent and encourage them to be more alert and cognizant of their surroundings. I too developed a heightened sense of awareness, not knowing whether the defendant had solicited others to undertake his mission. I was forced to take the defendant seriously because I know the depth of his violent nature. I offer the court a glimpse of the facts of those crimes not to exacerbate any punishment that the court may impose for his present offenses but as objective proof that my concerns were founded in provable, indeed already proven, facts.

The defendant was convicted of and sentenced for three separate robberies, two of which were armed robberies. I was assigned to prosecute those cases. The crimes took place in January, February and May of 2000. The defendant was the oldest and ringleader of his small band of thugs, and the violence visited upon the victims in those cases increased with each crime. The most serious offense took place on May 18th at 4:00 a.m. when the defendant and his accomplices broke into the home of Mr. and Mrs. Greene. Mr. Greene was specifically targeted for robbery. The defendant knew him to be a successful restauranteur and believed he would have on hand, or access to, large sums of cash. During that robbery the defendant used an aluminum baseball bat to kill a small dog. He also struck Mr. Greene several times with the bat. During that attack Mrs. Greene was able to escape and run to a neighbor's house and call the police. In preparing for trial of the three cases I spoke with each victim who described the terror exacted by their attackers. Mrs. Greene was particularly terrorized because in

leaving her home to summons help she was forced to leave behind her husband and her eleven year old stepson, of whose fate she was unsure. I also acquired the police reports of an armed robbery perpetrated by the defendant in Harford County in June 1997. Reverse waiver was granted in that matter and the defendant was adjudicated delinquent. In that case the defendant purchased BB guns, which resembled real handguns. He, along with another juvenile two years younger than he, robbed a young man and woman. The defendant and his accomplice were caught and confessed. A summary of the defendant's confession is attached hereto as exhibit A.

I would have preferred to ignore the solicitation to murder as idle banter of incarcerated felons with nothing better to do. However, knowing the defendant's propensity for violence, it would have been imprudent of me to do so. Consequently, the fact that I had to take his malevolent intent seriously necessitated that, to some degree, I modify how I managed my daily life. In that sense the defendant has robbed me of a certain level of personal security. I don't mean to suggest that the defendant's crime has resulted in paralyzing fear. I live a normal life and I am still capable of doing my job and fulfilling my responsibilities. However, the defendant's crimes [have] made me more mindful that, in fulfilling my professional responsibilities, I may subject myself and perhaps even my family, to unwarranted and undeserved future danger. As a result of the defendant's crime, I am not the same person that I was before I became aware of his criminal intent. The defendant has forced me to be more concerned for the safety of my family and myself. I should not have to feel such concern.

After getting the statement in full, Mr. Bishop filed a Motion for Reconsideration. Judge Norman heard argument again and denied the motion, and explained in detail why he had no actual bias based on his experience, and why there was no appearance of impropriety based on his examination of his victim impact statement:

In reviewing my own victim impact statement and, again, I think it bears repeating for the record, I had forgotten about this case. I have been involved in the criminal justice system for the better part of my life. I was a police officer for 12 years. I was a prosecutor for 20 years. And I have had lots and lots of cases. It is not actually the first time I have been threatened. You can't let that affect you.

I think in reviewing the victim impact [statement] . . . I was simply relating that, about the heightened sense of security that I had to take at the time, in the same way when someone goes—let's say they—they are in what is called a "high crime area" and they get out of their automobile to go up to the bank machine to get some money. In a high crime area people are going to be a little more cautious, a little more concerned, a little more thoughtful about what they are doing. That is what I meant to convey.

The *Denicolis* case did not thereafter affect my ability as a prosecutor for that period of time that I was a prosecutor to do my job fairly and impartially, and the circumstances there will not affect my ability to perform my duty and responsibility as a judge fairly and impartially.

\* \* \*

The situation here is that back in 2001 myself and Judge Levitz were thought to be victims in a solicitation to commit murder. Your argument is that your client is charged with a similar offense and therefore this Court could not be fair and impartial or at least, at the very least there is an appearance of impropriety. But I think when one would—looks at the totality of the circumstances, the reasonable person would not conclude that there is an appearance of impropriety. The fact that this Court has been able to do its job as a prosecutor following *Denicolis* and perform responsibly since being appointed to the bench is a clear indication of that.

9

### b. The Conflict Motion

In denying the Conflict Motion, the court explained that the Intern's role in Judge Norman's chambers had been limited, and that Mr. Bishop had not demonstrated (and could not) that her presence imputed special knowledge of the case to Judge Norman that might affect his ability to be impartial:

> We should identify who she is for the record. [The Intern] is an intern, which is distinct and different from my law clerk, . . . [who] started in August, will work through next August. [The latter] is a paid law clerk. [The former] is an intern.
>
> I often, as many judges do, accept interns. . . . She is here to learn the process. She is not a paid law clerk. She started, her very first day was August 25th. Her second day was August 27th and her third day was August 30th when these motions were brought to my attention when I met with the lawyers in chambers for the purposes of scheduling. I think that those time frames are important.
>
> As counsel knows, the presumption—to start with, there is a strong presumption in Maryland that judges are impartial participants in the legal process and the duty of a judge is to preside over cases and the duty to preside is as strong as their duty to refrain from presiding when not qualified or when recusal is pertinent.
>
> There is—along with that presumption, the party requesting recusal must prove that the trial judge has a personal bias or prejudice concerning the Defendant or personal knowledge or disputed events of the facts concerning the proceedings, and that can be found in *Boyd* [*v. State*, 321 Md. 69 (1990).] And indeed . . . [Mr. Bishop] cannot bear that burden. It is impossible for him to bear that burden. And the reason is quite simple: As he points out, [the Intern] was a part of a defense team. As such, certainly the Office of the Public Defender would have explained to her that she sits in the same

10

position as a defense attorney in terms of confidentiality. The reason why you couldn't meet that burden is because she has not said one word to me about this case other than the fact that she worked on it. And that came up, so the record is clear, on August 27th at a luncheon where [the Intern], along with the rest of my staff, was invited in honor of my outgoing law clerk . . . and we were talking about the schedule for Monday, August 30th that various things we had. And the fact that the *Bishop* hearing or actually pre trial conference was coming up was the first time that [the Intern] even related to me that she had worked on the case.

At that juncture, at that lunch I said to her, she is not to have any discussion with me about that and certainly she understands that because, as I'm sure the Public Defenders explained to her, she is in an attorney/client privilege situation. The suggestion that if she, if the Court keeps this case, that during the course of the proceedings she may come across motions and feel compelled . . . to violate the attorney-client privilege is preposterous.

First of all, in a death penalty case, . . . there is heightened scrutiny at all levels, including the appellate level. Mindful of that, . . . as a trial judge I control the motions in that case. I make sure that the court clerks properly enter the rulings on each motion so that when and if there is an appeal, that record is clean and clear. So the suggestion that this Court wouldn't have some control over that is preposterous.

As a practical matter, this case won't get tried until next year. [The Intern] will be here . . . two days a week as an intern through [the] early part of December. So even if motions come in, she won't have access to them and of course, she would continue to abide by her obligation to keep silent in terms of her attorney-client privilege.

So with regard to the motion to recuse this Court because of some appearance of impropriety, when looking at the appearance of impropriety, it is a slightly less standard. But again, as pointed out in *Boyd*, the Court talked about what that

11

standard is. And it states that—it specifically states "we disagree with our dissenting colleague's statement that recusal based on an appearance of impropriety requires us to judge the situation from the viewpoint of a reasonable person and not from the truly legalistic perspective. Like all legal issues, judges determine appearance of impropriety not by what a straw poll of the only partly informed man in the street would show, but by examining the record, facts and the law and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge."

Knowing what I have just said, *I don't see how any reasonable person using that definition could conclude that because [the Intern] was here for all of two days, and while she will continue to be here, that there is any appearance of impropriety.* So your motion for recusal on that basis is denied.

(Emphasis added.)

The Motion for Reconsideration contained two paragraphs at the end in which Mr. Bishop argued perfunctorily that the Intern's presence in the courtroom during the *hearing* on the Motions for Recusal and her presence in chambers during counsel's discussions with Judge Norman revealed her involvement in the case. The court rejected this argument too, giving the "full story" that the Intern attended the Recusal Hearing *at Mr. Bishop's counsel's request*, and that he never discussed the case with her:

I again harken back to your comment a moment ago that the record should reflect the full story. And I would be remiss if we didn't do that with regard to your argument concerning [the Intern. She] was an intern. As you can see, she is not here. She has served her internship and left the earlier part of this month. But you may recall that on . . . August 30th of 2010 we had a scheduling conference in my chambers when your motions for recusal I think were first presented. And you may recall that I certainly agreed to have a hearing on the matter which was held

12

on September 8th of 2010. You may recall, or perhaps you don't, that *on that day the defense requested that [the Intern] be present at the hearing because you wanted possibly to call her as a witness*. Now, I note as a matter of fact you never summonsed her as a witness, but the record should reflect *she was indeed here on that day, made available to you because you had requested that*. Your decision not to call her as a witness is your decision and I suspect that is because you know what she would have said and that is that she never discussed this matter with the Court, the matter of any involvement she had with Mr. Bishop with this Court, but it was an opportunity for you to call her and to certainly make your record.

So I find it . . . a tad disingenuous for you now to, in your motion, to suggest as a part of your affidavit that she was here. Yes, indeed she was here. She was here at your request and certainly nothing that took place in open court or our discussion in chambers concerning scheduling was in any way improper.

*So I reiterate, [the Intern] never discussed any matters concerning Mr. Bishop with this Court or anyone on my staff. And therefore, a reasonable person could not find that that was improper.*

(Emphasis added.)[2]

## 2. Trial and Sentencing

Because the State sought the death penalty from the outset, Mr. Bishop had the automatic right to remove the case to a jurisdiction other than the county of the crime. Md. Const. art. 4, § 8; *see also Johnson v. State*, 303 Md. 487, 508 (1985). He did so on February 3, 2011, and the case was transferred to the Circuit Court for Harford County on February

---

[2] On December 20, 2010, Mr. Bishop petitioned the Court of Appeals for a Writ of Mandamus "directing Judge Norman to recuse himself." The Court denied the petition on January 20, 2011.

10, 2011, but remained specially assigned to Judge Norman. The trial proceeded in October 2011, and the jury convicted Mr. Bishop of murder, conspiracy to commit murder, and use of a handgun in the commission of a crime of violence.

Because the State had sought the death penalty, the jury, rather than the court, determined Mr. Bishop's sentence on the murder charge. During deliberations, the jury sent a note to the court that asked "[W]hat is the difference between . . . life without parole and life with parole? How many years are served before parole is an option?" After consultation and agreement by counsel and Mr. Bishop, the court responded by drawing the following distinction:

> In response to your question concerning the difference between life without parole and life with parole, A, the term life—this is a term, the term life imprisonment without the possibility of parole means imprisonment for the natural life of the defendant. He will not be eligible for parole consideration, nor can be granted parole at any time during his natural life. Parenthetical, see Page eight of written instructions.
>
> * * *
>
> B, a person sentenced to life with the possibility of parole is eligible for parole after serving 25 years incarceration.

The jury ultimately concluded that the State had proven one aggravating circumstance, that Mr. Bishop committed the murder "pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder." Nonetheless, the jury did not impose the death penalty, but instead sentenced him to life with the possibility of parole. Among the mitigating factors the jury identified (which did not have to be unanimous, and we can't tell

14

on review how many jurors signed on to the finding) were (1) "mercy," and (2) the fact that Mr. Bishop was "not the sole proximate cause of the victim's death."

The court then sentenced Mr. Bishop on the conspiracy and handgun charges. Immediately beforehand, Mr. Bishop's counsel renewed the Motion for Recusal, which the court again denied. Mr. Bishop argued that fundamental fairness required the court to merge the conspiracy charge into the murder charge and that any additional sentence on the remaining counts should run concurrently with the jury's sentence for life with the possibility of parole because, he contended, any consecutive sentence would undermine the jury's decision to afford Mr. Bishop the possibility of parole.

The court considered these arguments carefully against the evidence, but rejected them:

> Let me first say that this Court has the greatest respect for the jury's time and effort and dedication in this case. If you examine their Findings and Sentencing Determination sheet, whether you agree with it or not, I think it is fairly obvious just from that evidence, that they took their responsibility very, very seriously. And you can glean that from some of the considerations in the mitigators.
>
> * * *
>
> And I don't know what went through the jury's mind, but *clearly they gave a great deal of thought and consideration in this case and this Court respects their decision*.
>
> However, [the] Court is not bound by perhaps some of the conclusions that we might infer—and it would be all it is, inferring, their conclusions. A good example, I think, is the issue of the sole proximate cause. [Mr. Bishop] was the sole

15

proximate cause of Mr. Porter's death. He counted to ten, went in, would have us believe that he closed his eyes. Perhaps that is what the jurors meant by manipulated or manipulative. Clearly he is a liar. We know that because he started out his confession by denying anything.

(Emphasis added.) The court then imposed consecutive sentences on the handgun and conspiracy charges:

> (1) use of a handgun in the commission of a crime of violence: 20 years (first five without parole), to run *consecutive to* the murder sentence;

> (2) conspiracy to commit first degree murder: life imprisonment to run *consecutive to* the sentence in (1) above.

Mr. Bishop filed this timely appeal.

## II. DISCUSSION

> *Four things belong to a judge:*
> *to hear courteously, to answer wisely,*
> *to consider soberly, and to decide impartially.*

> – Socrates[3]

Mr. Bishop asks us on appeal to find that the trial judge could not hear and decide his case impartially because of a past experience that arose in a very different context. He does so even though he raises *no* issues on appeal relating to *how* Judge Norman tried the case or any decisions Judge Norman made during the trial. Aside from his complaints about the sentence, which are grounded in a different theory of error, Mr. Bishop has not identified any

---

[3] J.K. Hoyt and Anne L. Ward, *The Cyclopaedia of Practical Quotations: English and Latin* 217 (8th ed. 1886).

16

decisions Judge Norman made that suggest any bias on the Judge's part against Mr. Bishop or that reflect any inability to try the case fairly and impartially.[4] We see neither actual nor apparent nor potential impropriety from Judge Norman's experience in *Denicolis* or his intern's prior involvement in Mr. Bishop's case. Nor did the court impose an illegal sentence when it declined to merge the conspiracy conviction with the murder conviction. To the contrary, the court acted within its discretion in directing the sentences for handgun possession and conspiracy to run consecutively rather than concurrently.

A.    **Judge Norman's Experience In *Denicolis* Did Not Warrant His Recusal, Nor Did His Intern's Prior Experience At The Public Defender's Office.**

We review a trial judge's decision to recuse (or not) for an abuse of discretion. *Surratt v. Prince George's County*, 320 Md. 439, 465 (1990); *In re Turney*, 311 Md. 246, 253 (1987).

> Where the alleged disqualification does not amount to a constitutional or legal disqualification, the question is left to the enlightened conscience, delicacy of feeling, and sense of fairness possessed by the individual judge. . . . Judges are selected to be useful public servants, and no judge's view of the proprieties in such questions should be carried to such an extent

---

[4] The issues, as worded by Mr. Bishop, are as follows:

1.    Whether the trial court committed reversible error in failing to recuse itself?

2.    Whether the trial court's consecutive sentences for conspiracy to commit murder and use of a handgun in the commission of a crime of violence were erroneous under the facts and circumstances of this case?

17

> as would result in the serious curtailment of his usefulness as a public officer.

*Ex Parte Bowles*, 164 Md. 318, 326 (1933); *Boyd v. State*, 321 Md. 69, 74-75 (1990) (quoting same). Moreover, "[t]he person seeking recusal bears a 'heavy burden to overcome the presumption of impartiality.'" *Karanikas v. Cartwright*, 209 Md. App. 571, 579 (quoting *Attorney Grievance Comm'n v. Blum*, 373 Md. 275, 297 (2003)), *cert. dismissed*, 436 Md. 73 (2013).

Judge Norman determined not once, but twice that he was obligated to hear Mr. Bishop's case and that neither his involvement in *Denicolis* nor his intern's presence in his office required otherwise. This case does not present a scenario where the defendant has been caught *directly* threatening the trial judge in an effort to cause an appearance of impropriety, a "reward" the courts routinely deny such litigants. *See, e.g, Regan v. State Bd. of Chiropractic Exam'rs*, 355 Md. 397, 414 (1999) ("[C]ourts have been most reluctant to find an appearance of impropriety on the basis of a litigant's actions."); *In re Extradition of Singh*, 123 F.R.D. 140, 149 (D.N.J. 1988) (no recusal based on the receipt of a threat because recusal "would only encourage litigants to send threats in the hope of forcing recusal and obtaining a different judge" (footnote omitted)). Instead, we have the unusual scenario where the defendant claims a specific document—the victim impact statement Judge Norman submitted in *Denicolis*—constitutes "direct evidence of the effect the allegedly disqualifying incident had on the judge." As Mr. Bishop puts it, "[a] member of the public, aware of the victim impact statement, could reasonably question whether this incident affected Judge

Norman's ability to be impartial." The State counters that Mr. Bishop cannot "overcome the strong presumption of judicial impartiality," and that the cases Mr. Bishop invokes present entirely different fact patterns.

With regard to the Intern, Mr. Bishop claims that her employment in Judge Norman's chambers as an intern "allowed for the possibility of personal bias" and created the appearance of impropriety. The State replies that there was no suggestion that the Intern relayed any information to Judge Norman regarding Mr. Bishop's case, and therefore no need for the judge to recuse himself. We take the issues in order.

### 1. Judge Norman's involvement in *Denicolis* did not create the appearance of impropriety.

The Maryland Code of Judicial Conduct governs the behavior of trial judges within and beyond the courts, and directs judges to take or avoid actions that would undermine the public's confidence in a proceeding:

**Rule 1.2    Promoting Confidence in the Judiciary.**

   (a)    A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary.

   (b)    A judge shall avoid conduct that would create in reasonable minds *a perception of impropriety*.

Md. Rule 16-813, Maryland Code of Judicial Conduct, Rule 1.2 (2013) (emphasis added). As the Court of Appeals has explained, "[i]t is because judges occupy a distinguished and decisive position that they are required to maintain high standards of conduct." *Jefferson-El*

*v. State*, 330 Md. 99, 106 (1993) (citations omitted). Rule 1.2(b) lays out the general "appearance of impropriety" standard that judges must follow.

But Rule 1.2 is not the only relevant rule. Rule 2.7, "Responsibility to Decide," affirmatively directs a judge to "hear and decide matters assigned to the judge *unless* recusal is appropriate" (emphasis added). The Comment to the Rule explains why:

> Although there are times when disqualification is necessary or appropriate to protect the rights of litigants and preserve public confidence in the independence, integrity, and impartiality of the judiciary, judges must be available to decide matters that come before the courts. The dignity of the court, the judge's respect for fulfillment of judicial duties, and a proper concern for the burdens that may be imposed upon the judge's colleagues require that a judge *not use disqualification to avoid cases that present difficult, controversial, or unpopular issues.*

Rule 2.7, Comment (emphasis added); *see also Turney*, 311 Md. at 253 ("Determining whether recusal is required to avoid the appearance of impropriety may often be a difficult task. A high level of confidence in one's ability to be fair and impartial may actually interfere with the proper assessment of the problem of appearance of impropriety. Moreover, a judge's duty to sit where not disqualified is equally as strong as the duty not to sit where disqualified.").

In *Boyd v. State*, 321 Md. 69 (1990), the Court of Appeals established the proper test in determining whether the judge there had acted with any appearance of impropriety— suitably, in a case involving the murder of a husband by his wife. *Id.* at 72-73. The trial judge there had presided at the bench trial of one of the co-defendants, and was assigned to preside

at the trials of the remaining defendants, one of whom sought his recusal because he had decided the other case. The Court of Appeals held that the circuit court judge had declined properly to recuse himself based on personal bias or prejudice because the knowledge acquired by the trial judge in the prior proceedings did not constitute "personal knowledge or bias" that required disqualification. *Id.* at 76. The Court then considered whether the trial judge should have declined to hear the successive trials to avoid the appearance of impropriety, and held that a judge's decision to preside or recuse depends on the individual facts and circumstances of the case(s):

> "[T]he test to be applied is an objective one which assumes that a reasonable person *knows and understands all the relevant facts.* We disagree with our dissenting colleague's statement that recusal based on an appearance of impropriety . . . 'requires us to judge the situation from the viewpoint of the reasonable person, and not from a purely legalistic perspective.' Like all legal issues, judges determine appearance of impropriety—not by considering what a straw poll of the only partly informed man-in-the-street would show—but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge."

*Id.* at 86 (citations omitted) (emphasis in original) (quoting *In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1313 (2d Cir. 1988)).

In *Jefferson-El*, the Court of Appeals examined whether a trial judge should have recused himself in a violation of probation proceeding for a defendant at whose trial he had presided several years earlier. Importantly, the judge had reacted strongly, and negatively, to the earlier jury's decision to acquit the defendant:

21

I just hope the ladies and gentlemen, that you had a very good reason for the verdict that you rendered in this case. You know, you're supposed to be protecting the community. I hope and pray that when you go home tonight and you think about this situation, and think about what you've just done. That you believe that you've protected this community.

On behalf of the court, we extend our thanks to you for your service. But I can tell you that *your verdict is an abomination*, and it has no relationship to reality [or] justice. I want you, all of you, the ladies on this jury to think about what you've just done.

*Jefferson-El*, 330 Md. at 102. When the defendant came before the same judge on a probation violation charge in connection with the earlier case, he asked the trial judge to recuse himself, and the court denied the motion. *Id.* at 102-03.

The Court of Appeals reversed. The Court reiterated the test set forth in *Boyd*, stressing too that our cases mandate recusal where a member of the public might "'*reasonably question*'" the judge's impartiality. 330 Md. at 108 (emphasis in original) (quoting *Surratt*, 320 Md. at 468); *see also Surratt*, 320 Md. at 466 (holding that trial judge should have permitted another judge to *decide* motion for recusal where attorney alleged he'd made overtures to her and retaliated against her client when he was rebuffed); *Turney*, 311 Md. at 252-53 (holding that trial judge should have recused himself *sua sponte* from the trial of a defendant whose source for a forged driver's license, it became apparent to the judge during trial, was his former wife's stepson). In *Jefferson-El*, though, the Court of Appeals held that the trial judge should have recused himself because he had upbraided the jury for acquitting this defendant in a manner that "left no doubt as to his displeasure." 330 Md. at

109. The Court explained that not only could a reasonable member of the community have concluded that he could not be impartial, but that the court's conduct toward the defendant at the subsequent probation violation hearing reinforced that conclusion. *Id.* at 109-10. The Court was careful to point out that it was *not* finding personal bias, but focusing on the *appearance of impropriety* that flowed from the judge's remarks. *Id.* at 110.[5]

In this case, we do not face the "difficult task" referenced in *Turney*, 311 Md. at 253, because Mr. Bishop has not identified any facts or circumstances that might have interfered with Judge Norman's ability to try his case fairly or impartially. We agree with Mr. Bishop that the context here is "unusual"—not because it presents a compelling basis for recusal, but because the backdrop is atypical. *First*, none of the factors Mr. Bishop cites as "extraordinary" actually supports recusal. Although it is true that the judge was the intended victim of a crime, it was not "very similar to the ones with which Mr. Bishop is charged," as he claims. Judge Norman was a prosecutor, the victim here a husband. The motives obviously would have differed, the evidence would have differed, and then-prosecutor Norman had no personal relationship with the defendant, Mr. Denicolis. Although the victim impact statement does, as Mr. Bishop contends, reveal "that he actually did suffer fear and anxiety," it doesn't speak in general terms; rather, Judge Norman related specifically the effect that *Mr.*

---

[5] The *Jefferson-El* Court pointed out that the trial judge's comments there also ran afoul of the then-applicable rule that prohibited judges from "praising or criticizing a jury's verdict." *Jefferson-El*, 330 Md. at 105 (citing Maryland Rule Canon 3 A(8), then in effect). That prohibition currently appears in Md. Rule 16-813, Maryland Code of Judicial Conduct, Rule 2.8(c) (2013) ("A judge shall not commend or criticize jurors for their verdict other than in a court order or opinion in a proceeding.").

*Denicolis's* attempts on his life had on him. Every part of his victim impact statement stressed a specific concern about becoming *Mr. Denicolis's* victim:

> Unlike the victim of a crime who is merely a target of opportunity, I was specifically targeted as the object of the defendant's criminal endeavor, singled out because I fulfilled my professional responsibilities as a prosecutor.
>
> The Baltimore County police informed me of the solicitation to murder so that I could take whatever measures I deemed necessary for the safety of my family and myself. There was little I could do except to put my family on notice of the defendant's intent and encourage them to be more alert and cognizant of their surroundings. *I too developed a heightened sense of awareness, not knowing whether the defendant had solicited others to undertake his mission. I was forced to take the defendant seriously because I know the depth of his violent nature.*
>
> * * *
>
> [K]nowing the defendant's propensity for violence, it would have been imprudent of me to do so. Consequently, the fact that I had to take his malevolent intent seriously necessitated that, to some degree, I modify how I managed my daily life. *In that sense the defendant has robbed me of a certain level of personal security.* I don't meant to suggest that the defendant's crime has resulted in paralyzing fear. I live a normal life and I am still capable of doing my job and fulfilling my responsibilities. However, the defendant's crimes [have] made me more mindful that, in fulfilling my professional responsibilities, I may subject myself and perhaps even my family, to unwarranted and undeserved future danger. *As a result of the defendant's crime, I am not the same person that I was before I became aware of his criminal intent.* The defendant has forced me to be more concerned for the safety of my family and myself. I should not have to feel such concern.

(Emphasis added.)

24

We agree that Judge Norman's statement does not suggest that the crime had any overall impact on his ability to do his job or live his life, and it certainly does not suggest that his decision-making in a spousal murder-for-hire case would in any way be tainted. And nothing in the record suggests that Judge Norman *in fact* was influenced by that prior experience. We disagree that Judge Norman's statements at the hearing on the Motion for Reconsideration are irreconcilable with his victim impact statement, and further disagree that any "reasonable member of the public" who knew the facts would so conclude.

*Second*, the fact that this was a death penalty case does not change our analysis. We are mindful that Mr. Bishop's life was at stake, at the outset at least, and it may be that a judge facing a closer question might feel called to recuse on a lesser showing in a death penalty case than he otherwise might. But the State's death penalty request does not in and of itself compel recusal, and Mr. Bishop's blanket assertion that the violent nature of the intended plot presents "the danger that this will affect the judge's ability to be fair and impartial in similar cases [as] exponentially greater" finds no support in the cases or the record of this case.

*Finally*, the two remaining cases Mr. Bishop invokes present situations altogether different from this one. Both are federal cases in which the courts held that a trial judge's recusal was required. *In re Nettles*, 394 F.3d 1001 (7th Cir. 2005); *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995). Mr. Bishop claims that in these cases, as in this one, the judges were "in some sense" victims. And although that is true, that fact is not the common thread that

25

ties these cases together. Instead, both turn on the fact that the trial judge would have been trying a defendant charged with crimes directed at the judge him- or herself. In *Nettles*, the defendant had plotted to destroy the federal courthouse, and the United States Court of Appeals for the Seventh Circuit held that she was entitled to a writ of mandamus recusing all the judges in *that courthouse* from presiding because the appearance of impropriety for the judges housed in *that building* was too great:

> A reasonable observer would think that a judge who works in the . . . building would want Nettles to be convicted and given a long sentence, rather than to be set free . . . to make another attempt to destroy the courthouse or its occupants.

*Nettles*, 394 F.3d at 1003. Indeed, the entire Seventh Circuit recused itself as well, pointing out that even as it felt no actual prejudice, "a reasonable observer might conclude that, should [the defendant] be convicted and sentenced, and appeal, he would no more get a fair shake in our court than he would in the district court." *Id.*

The United States Court of Appeals for the Tenth Circuit reached a similar conclusion in *Nichols*, in which the defendant was charged in connection with a domestic terrorist attack that killed 169 people and "inflicted massive damage" to the Alfred P. Murrah Federal Building in Oklahoma City. 71 F.3d at 349. The chambers of many trial judges were damaged, including those of the judge assigned at random to preside over the case. Mr. Nichols filed a motion to recuse the trial judge, and the Tenth Circuit agreed on appeal that recusal was mandated under the federal statute that parallels Maryland's Rule 1.2. *Id.* at 350-51; *see* 28 U.S.C. § 455(a) (2013). The Tenth Circuit noted how "extremely fact driven" such

26

cases are, *Nichols*, 71 F.3d at 351, and that they "'must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'" *Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)). The court concluded that the specific circumstances were so extraordinary that a reasonable person could have doubts about the judge's impartiality:

> Judge Alley's courtroom and chambers were one block away from the epicenter of a massive explosion that literally rocked downtown Oklahoma City, heavily damaged the Murrah building, killed 169 people, and injured many others. The blast crushed the courthouse's glass doors, shattered numerous windows, ripped plaster from ceilings, dislodged light fixtures, showered floors with glass, damaged Judge Alley's courtroom and chambers, and injured a member of his staff, as well as other court personnel and their families. Based on these circumstances, we conclude that a reasonable person could not help but harbor doubts about the impartiality of Judge Alley. Because Judge Alley's "impartiality might reasonably be questioned" in the instant case, 28 U.S.C. § 455(a) mandates recusal.

*Id.* at 352.

The "fact-driven" cases of *Nettles* and *Nichols* share nothing with Mr. Bishop's case. The trial judges in those cases personally felt the impact from the crimes at issue, whereas Judge Norman's comparable experience involved a different defendant and a different context that had occurred over a decade previously. We find no error in Judge Norman's decision to hear and decide the case under these circumstances.

27

**2.** **The Intern's prior involvement in Mr. Bishop's case created no opportunity for personal bias by Judge Norman nor any appearance of impropriety.**

Beyond the appearance of impropriety articulated in Rule 1.2(b), Rule 2.11 provides specific circumstances in which a judge should disqualify himself, specifically where the judge suffers from personal bias or has personal knowledge of disputed facts:

**Rule 2.11** **Disqualification**

(a) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including the following circumstances:

(1) The judge has a *personal bias* or prejudice concerning a party or a party's lawyer, or *personal knowledge of facts* that are in dispute in the proceeding.

*Id.* (emphasis added). The Court of Appeals explained in *Jefferson-El* that "there is a strong presumption in Maryland and elsewhere that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified." 330 Md. at 107 (citations omitted).

The Rule's "personal bias" prohibition generally comes into play where a judge has presided over one case involving a defendant and must consider whether he should preside over a subsequent trial. In *Doering v. Fader*, 316 Md. 351 (1989), for example, the Court of Appeals held that the trial judge had improperly recused himself from the sentencing portion of a capital defendant's trial. *Id.* at 357-58. The judge, who had presided over the jury trial,

explained that he would not have imposed the death sentence based on the facts of the case. In explaining the nature of the personal bias, the Court pointed out that there was nothing to suggest that the trial judge had "received any information other than that which was properly produced during previous court proceedings in this case." *Id.* at 357 (footnote omitted). Rather, the Court found that the "trial judge misperceived the nature of the extrajudicial facts he was precluded from considering"—to wit, that "the decision to recuse was [improperly] based upon [the trial judge's] belief that he would have to be able to completely put out of his mind all that he had heard before in this case in order to be competent to sit. In this belief he was wrong." *Id.*

The Rule does not state with clarity whether the bias or prejudice must be *actually* held by the judge or can be *imputed* to the judge. But the "appearance of impropriety" standard described above suggests the former, and the Court of Appeals's holding in *Boyd* does too:

> [I]t has been said that "[a] judge is presumed to be impartial," *United States v. Sidener*, 876 F.2d 1334, 1336 (7th Cir. 1989); that "[a] judge is presumed not to confuse the evidence in one case with that in another," *Dove v. Peyton,* 343 F.2d 210, 214 (4th Cir. 1965); and, that "judges are men [and women] of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence," *State v. Babb*, 258 Md. 547, 550 (1970). As Blackstone put it, "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3 W. Blackstone, *Commentaries of Laws of England* 361 (1st ed. 1769). Thus, where an allegation of actual bias or prejudice is made, *the*

> *burden is upon the defendant to make that showing from the record. Carey v. State*, 43 Md. App. 246, 248-49 (1979).

*Boyd v. State*, 321 Md. 69, 80-81 (1990) (emphasis added). That burden may be met where a party is able to demonstrate *actual* knowledge of facts in dispute. *See, e.g.*, *Smith v. State*, 64 Md. App. 625, 634 (1985) (holding that recusal was warranted where trial judge "took it upon himself, through his clerk, to unearth information about a case he was to try"); *Ware v. Warden*, 2 Md. App. 728, 730 (1968) (holding that where prosecutor at defendant's trial ultimately became a judge, it was inappropriate for him to preside over a post-conviction proceeding).

Judge Norman did not err in declining to disqualify himself from this case. At the threshold, he had no personal knowledge of the facts of this case, nor the defense's strategy. Nor could the record support a finding that the Intern's knowledge (the testimony does not reveal the full extent of what she knew, but there is no evidence suggesting it was detailed or extensive) should be imputed to him. He took pains to explain, both at the Recusal Hearing and the Reconsideration Hearing, that as soon as he became aware of the Intern's involvement in Mr. Bishop's case (which surfaced on her third day in his chambers), he told her not to speak to him about it. That ended it. And the way that counsel for Mr. Bishop approached the Motion for Reconsideration suggests a certain level of gamesmanship (at least as Judge Norman saw it) that should not have been rewarded by granting the Motion to Recuse: Mr. Bishop had *requested* that the Intern attend the Recusal Hearing (apparently suggesting that it might be necessary to question her about the facts), and then, on the Motion

30

for Reconsideration, argued that her presence at that hearing meant she was inappropriately playing an "ongoing role" in the case. But the hearing was open to the public, and her presence in the gallery during a hearing at which Judge Norman presided could not have imparted or imputed any outside-the-record knowledge to *him*.

Nor do we see see any basis on this record on which a reasonable person could question Judge Norman's impartiality. To the contrary, his undisputed instruction to the Intern that they not discuss the case was designed to prevent such an appearance from forming, and there is no suggestion (beyond pure speculation) that his instruction was not followed. Put another way, the fact that Mr. Bishop's case came before Judge Norman over the course of this Intern's internship cannot, on its own, give rise to an objectively reasonable inference of bias or impropriety.

To be blunt, the only way we could find that the Intern's presence required Judge Norman to recuse himself would be for us to decide that Judge Norman was lying when he told the parties that he had had no communications with her about Mr. Bishop's case. There is *zero* evidence to support such a finding, nor has counsel argued that there is. Instead, Mr. Bishop has raised the abstract possibility of prejudice inuring from the Intern's presence in Judge Norman's chambers. That hypothetical concern cannot overcome the legal presumption that Judge Norman's decision was correct or the undisputed record supporting that decision.

**B.** **The Circuit Court Did Not Err By Declining To Merge The Sentences For Murder And Conspiracy To Commit Murder, Or By Refusing To Impose A Concurrent Sentence For Handgun Possession.**

Although Mr. Bishop renewed his motion to recuse at the time of sentencing, he did not appeal the circuit court's denial of the motion with respect to sentencing in particular, at least as far as his brief reflects. So we review the question of the propriety of sentencing only with respect to the grounds he articulates: *first*, that his sentence for conspiracy must merge with the murder sentence; and *second*, that "[u]nder the facts and circumstances of this case," the trial court abused its discretion in imposing sentences for conspiracy and use of a handgun in the commission of a crime of violence consecutive to, rather than concurrent with, the sentence for murder that the jury imposed. Neither assertion is correct.

### 1. The conspiracy sentence does not merge with the murder sentence.

Mr. Bishop claims his sentence is illegal because the trial judge did not merge the sentence for conspiracy with the jury's sentence of life with parole. An illegal sentence may be corrected at any time. *See* Md. Rule 4-345(a). We "address the legal issue of the sentencing . . . under a *de novo* standard of review." *Blickenstaff v. State*, 393 Md. 680, 683 (2006). As the Court of Appeals explained in *Chaney v. State*, 397 Md. 460 (2007), a defendant may attack the sentence by way of direct appeal, or "collaterally and belatedly" through the trial court, and then on appeal from that denial. *Id.* at 466. That said, the scope of the potential remedy is narrow:

> [T]his category of "illegal sentence" [is] limited to those *situations in which the illegality inheres in the sentence itself*; *i.e.*, there either has been no conviction warranting any sentence for the particular offense or the sentence is not a permitted one for the conviction upon which it was imposed and, for either reason, is intrinsically and substantively unlawful.

*Id.* at 466-67 (emphasis added).

Mr. Bishop's counsel argued at the sentencing hearing that because the jury found that a murder for hire "necessarily" involved a conspiracy, the trial court's decision not to merge the sentences for conspiracy and murder effectively nullified the jury's decision to impose a life sentence with the possibility of parole:

> If you are going to have a contractor and a contractee, that is obviously going to include two people. And so the jury has looked at the conspiracy because that was the basis of the contract, so to speak, and they have returned a verdict of life, permitting Mr. Bishop to be eligible for parole in 25 years. [¶] We are concerned that if they are not required to merge, that at least in terms of fundamental fairness and the rule of lenity . . . the sentences must run concurrent, that to impose a consecutive sentence under the conspiracy charge would be punitive and would nullify the jury's verdict.

Mr. Bishop's counsel relied on *Monoker v. State*, 321 Md. 214 (1990), to support this position. The trial court disagreed, and stated that in *Monoker*, the crimes and the rationale were different—there, the Court of Appeals merged the sentences because it found solicitation a "lesser included offense" that merged into conspiracy. *Id.* at 220. Mr. Bishop raises *Monoker* again here, and argues from that case (and others that we distinguish below), that "[u]nder the unique circumstances of this case, the crimes of conspiracy to commit

33

murder and murder were 'part and parcel' of one another and the conspiracy was 'an integral component' of the murder" (quoting *Carroll v. State*, 428 Md. 679, 695 (2012)). The State responds that the crime of conspiracy is "separate and distinct" from the crime of murder and the two do not merge (quoting *Grandison v. State*, 305 Md. 685, 759 (1986)).

The broader term "merger" (and its grammatical variants) encompasses three different principles of sentencing. The overarching merger doctrine finds its roots in the double jeopardy clauses of federal and Maryland common law, *Moore v. State*, 198 Md. App. 655, 684-85 (2011), and "provides the criminally accused with protection from . . . multiple punishment stemming from the same offense." *Purnell v. State*, 375 Md. 678, 691 (2003) (footnote omitted). The Court of Appeals has recently reaffirmed that we recognize "three grounds for merging a defendant's convictions: (1) the required evidence test; (2) the rule of lenity; and (3) 'the principle of fundamental fairness.'" *Carroll*, 428 Md. at 693-94 (quoting *Monoker*, 321 Md. at 222-23).

We can eliminate the first of these quickly. "The required evidence test focuses on the elements of each crime in an effort to determine whether all the elements of one crime are necessarily in evidence to support a finding of the other, such that the first is subsumed as a lesser included offense of the second." *Monoker v. State*, 321 Md. at 220 (1990). After *Grandison*, 305 Md. at 759, though, the required evidence test does not merge sentences for conspiracy to commit murder and murder, nor does Mr. Bishop claim it does. He seems to suggest (but doesn't actually come out and say it) that the rule of lenity should apply to merge

them instead.

The rule of lenity provides that a defendant should not be punished for two crimes, at least one of which has been created by statute, by means of two sentences *if* the defendant can show that the Legislature intended that the offenses be punished by one. If there is uncertainty as to the legislative intent, we apply the rule of lenity to "give the defendant the benefit of the doubt," *Monoker*, 321 Md. at 222, and merge the sentences. *See also Khalifa v. State*, 382 Md. 400, 435-37 (2004) (declining to merge convictions for *abduction* of a child and *detention* of a child, as statutorily discrete offenses, and likewise declining to merge *detention* and *conspiracy* convictions, seeing no "statutory ambiguity" that would compel merger). Here, Mr. Bishop was indicted for first-degree murder pursuant to CL § 2-201 and § 2-208, for conspiracy under common law, and for handgun possession under CL § 4-204. Nonetheless, Mr. Bishop doesn't seriously contend that the rule of lenity applies: he raises no *specific* argument that it does and cites to no statutes or legislative history that suggests it might, and we see no basis on which to conclude that the General Assembly might have intended the handgun charge to merge.

This leaves us with the principle of fundamental fairness. We recently held in *Dionas v. State*, 199 Md. App. 483 (2011), *rev'd on other grounds*, 436 Md. 97 (2013), that the fundamental fairness doctrine did not merge sentences for conspiracy to commit first-degree murder and second-degree murder. *Id.* at 530. Notably, we did not base that decision on any distinction between the nature of the conspiracy relating to *first-degree* murder and the

35

underlying conviction for *second-degree* murder. Rather, we relied on the Court of Appeals's

decision in *Alston v. State*, 414 Md. 92 (2010), which characterized a conspiracy to commit

a crime as *entirely separate* from the underlying substantive crime:

> "[O]nce the agreement to murder has been made, the crime is complete without any further action. . . . Conspiracy to murder requires an agreement, while murder, regardless of whether one is convicted as an accessory or a principal, requires the completed crime. Thus it is apparent that the conspiracy to murder is a separate and distinct crime from the substantive crime itself."

*Alston*, 414 Md. at 114 (quoting *Grandison*, 305 Md. at 759); *see also Kelly v. State*, 195 Md.

App. 403, 442 (2010) ("[C]onspiracy is not 'part and parcel' of or 'incidental to' the

substantive offense; it is a separate offense. Principles of fairness do not prevent separate

sentences for these separate offenses.").

In *Carroll*, the Court's research revealed only two cases as of 2012 in which

"Maryland courts have required merger based solely on the principle of fundamental

fairness"—*Monoker* and *Marquardt v. State*, 164 Md. App. 95 (2005), and we have found

none that have done so after *Carroll*. *See Carroll*, 428 Md. at 695 n.6. In *Monoker*, the Court

reasoned that the sentences for solicitation and conspiracy should merge "because the

solicitation was part and parcel of the ultimate conspiracy and thereby an *integral component*

of it, [and] it would be fundamentally unfair to Monoker for us to require him to suffer twice,

once for the greater crime and once for a lesser included offense of that crime." 321 Md. at

223-24 (emphasis added). And in *Marquardt*, we permitted merging sentences for malicious

destruction of property and fourth-degree burglary because "the malicious destruction of the property was clearly incidental to the breaking and entering." 164 Md. App. at 152. *But see Claggett v. State*, 108 Md. App. 32, 53-54 (1996) (permitting merger based *not only* on fundamental fairness but also on the rule of lenity, where General Assembly would not have wanted to permit two separate sentences for the "singular striking of one victim," and allowing merger of convictions for a statutory assault conviction and a common-law battery conviction both based on the same act).

Mr. Bishop does not suggest that his murder conviction might justify invoking the rule of lenity in combination with a fundamental fairness argument, as the Court did in *Claggett*. *Id.* And the obvious flaw in Mr. Bishop's fundamental fairness argument is that these two crimes *are* separate and distinct. Even if the murder plot had not succeeded, Mr. Bishop could still have been convicted for conspiracy to commit murder—a charge to which he opened himself as soon as he agreed with Ms. Porter to murder her husband, and regardless of whether the plan worked. That it did can hardly allow him to work his way out of the sentence for conspiracy as well.

### 2. Judge Norman did not improperly undermine the role of the jury by imposing consecutive sentences.

We review the trial court's sentencing decision overall for abuse of discretion, since that decision is, by its nature, fact-based. "A judge should fashion a sentence based upon the facts and circumstances of the crime committed and the background of the defendant, including his or her reputation, prior offenses, health, habits, mental and moral propensities,

37

and social background," *Poe v. State*, 341 Md. 523, 532 (1996) (citations omitted), and the trial judge is given "broad latitude to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation," *State v. Dopkowski*, 325 Md. 671, 679 (1992) (citations omitted). Appellate courts review sentences for only three forms of error:

> "(1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) *whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations*; and (3) whether the sentence is within statutory limits."

*Jackson v. State*, 364 Md. 192, 200 (2001) (emphasis in original)(quoting *Gary v. State*, 341 Md. 513, 516 (1996)).

Mr. Bishop argues that the trial court erred when it imposed sentences consecutive to his murder sentence for the handgun possession and conspiracy convictions. He contends that "under the facts and circumstances of this case," Judge Norman abused his discretion because the consecutive sentences undermined the jury's determination that he should be eligible for parole, and because they had the appearance of "ill-will"—or, as Mr. Bishop keeps suggesting, vindictiveness.[6] The State claims preliminarily that this issue was not properly preserved and that, if it was, Judge Norman did not have to merge the sentences. It

---

[6] Curiously, Mr. Bishop doesn't clarify what event or events purportedly *caused* this alleged vindictiveness on Judge Norman's part. We can't tell from the brief whether he is suggesting (most obliquely) that Judge Norman's involvement in *Denicolis* somehow gives rise to an inference that he bears some ill-will toward anyone who undertakes a contract killing, an argument that is both far-fetched and unsupported in this record. We see no other basis for the argument, but address it nonetheless.

also claims that Mr. Bishop has failed to show any "impermissible considerations" that Judge Norman ostensibly took into account, or any manner in which he acted vindictively when imposing the sentences.

We are willing to give Mr. Bishop the benefit of the doubt on the State's waiver argument and proceed to consider his claim; even though he did not specifically raise the merger claim regarding his handgun conviction, he re-raised his Motion for Recusal at sentencing, which could arguably be construed as raising generalized claims of "the appearance of vindictiveness." But he points to no comments by the trial court, errors in law, or other behavior that might suggest any such vindictiveness on the part of Judge Norman, and we agree with the State that this case presented no "facts and circumstances" that mandated a different outcome.

*First*, we disagree that Judge Norman's decision to impose consecutive sentences for these two convictions "undermined" the jury's decision to leave open the possibility that Mr. Bishop might be eligible for parole in twenty-five years. Contrary to Mr. Bishop's suggestion, Judge Norman did not set out somehow to trick the jury into thinking Mr. Bishop would be parole-eligible in twenty-five years or promise that a decision to impose life with parole would guarantee him a parole opportunity. The jury deliberations reflect that it did not reach a unanimous decision regarding whether to impose a sentence of life without the possibility of parole. Judge Norman said nothing to suggest that that sentence was incorrect or that he disagreed with it—at most, he didn't "pretend to understand" some part of it, and

stated, "I don't know what went through the jury's mind, but clearly they gave a great deal of thought and consideration in this case and this Court respects their decision."

The jury's responsibility ended once it sentenced Mr. Bishop for murder. When he committed the other crimes—conspiring to murder Mr. Porter and possessing a handgun in the course of doing so—he exposed himself to punishment for those crimes too, punishments the court would impose. The fact that the jury was tasked with sentencing on the only crime for which he could have received the death penalty does not relieve him of punishment for those crimes or estop the court to run punishment for those crimes concurrent to the murder sentence.

The "'virtually boundless discretion'" vested in the trial court with regard to sentencing, *Dopkowski*, 324 Md. at 679 (quoting *Logan v. State*, 289 Md. 460, 480 (1981)), does not allow the court to impose restrictions on parole, *Reiger v. State*, 170 Md. App. 693, 706 (2006), which seems to be what Mr. Bishop claims happened here. But in *Reiger*, we actually permitted the trial court to *account for* the timing of parole in calculating a sentence. Mr. Bishop keeps returning to the fact that Judge Norman told the jury that he would be parole-eligible in twenty-five years, but again, that statement related *only* to the sentence for the crime the jury was considering, and did not relate to the not-yet-imposed sentences on the remaining charges.

*Finally*, although we recognize that a judge should not be "motivated by ill-will, prejudice or other impermissible considerations" at sentencing, *Jackson*, 364 Md. at 199, that

principle does not affect our analysis here. We explained the breadth of the trial court's discretion in *Reiger*:

> The sentencing court has "virtually boundless discretion" in imposing a sentence. *See State v. Dopkowski*, 325 Md. 671, 679 (1992). Consequently, "[a] trial judge may impose any sentence not in violation of constitutional requirements or statutory limits, so long as it is not motivated by ill-will, prejudice or other impermissible considerations." *Douglas v. State*, 130 Md. App. 666, 677-78 (2000). The "extremely limited" grounds upon which criminal sentences may be appealed include "whether the sentencing judge was motivated by . . . impermissible considerations." *See Jackson v. State*, 364 Md. 192, 200 (2001); *Teasley v. State*, 298 Md. 364, 370 (1984).

170 Md. App. at 697-98. But a finding that impermissible considerations came into play must have *some* grounding in facts, and Mr. Bishop raises the specter of ill-will without pointing to *any* conduct by the judge that might support it. *See Curry v. State*, 60 Md. App. 171, 184 (1984) (holding that trial judge *came close* to crossing the line into an "appearance of vindictiveness" when she explicitly found that the defendants had "gotten a great deal of leniency and benefit from their retrial," as she imposed the maximum sentence, but affirming sentence nonetheless). Accordingly, we find no abuse of discretion in the court's sentencing decisions.

**JUDGMENTS OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**